1   JONATHAN J. DELSHAD, SBN 246176
    jdelshad@delshadlegal.com (admission pending)
2   ELIE GHODSI, SBN 297961
    eghodsi@delshadlegal.com (admission pending)
3   LAW OFFICES OF JONATHAN J. DELSHAD, PC
    1663 Sawtelle Blvd., Suite 220
4   Los Angeles, CA  90025
    Telephone:    424.255.8376
5   Fax:            424.256.7899

6   Attorneys for Plaintiffs and Putative Class

7   [*Additional counsel for Plaintiffs on following page*]

8                   **UNITED STATES DISTRICT COURT**

9               **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 10  KEVIN HOGAN, SHANNON CURRELL, DENNIS RUSSELL, NGOC LY, JUSTIN HARRIS, ALEXANDER POLONSKY, BRIAN ZAGHI, CHERYL STRATEMEYER, JEREMY KAHN, MARK HUDDLESTON, and BRENT LEVINSON, each individually, and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>vs.<br><br>WELLS FARGO & COMPANY; WELLS FARGO BANK, N.A.; WELLS FARGO SECURITIES, LLC; and DOES 1 through 50, inclusive,<br><br>          Defendants. | Case No.:   3:16-cv-07360<br><br>**CLASS AND COLLECTIVE ACTION**<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF:**<br><br>1.  Violation of Fair Labor Standards Act<br>2.  Violation of Dodd-Frank Act<br>3.  Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)<br>4.  Conspiracy to Violate RICO<br>5.  Wrongful Termination/Retaliation in Violation of Cal. Labor Code § 1102.5<br>6.  Wrongful Termination/Retaliation in Violation of Public Policy<br>7.  Violation of Cal. Business and Professions Code § 17200, *et seq.*<br>8.  Breach of the Implied Covenant of Good Faith and Fair Dealing<br>9.  Intentional Infliction of Emotional Distress<br>10. Negligent Infliction of Emotional Distress<br>11. Failure to Pay Overtime Compensation (Cal. Labor Code § 1194)<br>12. Failure to Provide and/or Authorize Meal and Rest Periods (California Labor Code §§ 512, 226.7)<br>13. Waiting Time Penalties (Cal. Labor Code § 203)<br>14. Failure to Provide Itemized Wage Statements (Cal. Labor Code § 226) |

15. Declaratory Relief (Declaratory
    Judgment Act, 28 U.S.C. §§ 2201, 2202)
16. Injunctive Relief

**<u>JURY TRIAL DEMANDED</u>**

BENJAMIN SCHONBRUN, SBN 118323
schonbrun.ben@gmail.com
WILMER J. HARRIS, SBN 150407
wharris@sshhlaw.com (admission pending)
MICHAEL D. SEPLOW, SBN 150183
mseplow@sshhlaw.com
AIDAN C. MCGLAZE, SBN 277270
amcglaze@sshhlaw.com
SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP
723 Ocean Front Walk
Venice, CA  90291
Telephone: (310) 396-0731
Facsimile: (310) 399-7040

STEVEN L. STEMERMAN, SBN 67690
stem@dcbsf.com
SARAH GROSSMAN-SWENSON, SBN 259792
sgs@dcbsf.com
YONINA ALEXANDER, SBN 284908
valexander.com
MCCRACKEN, STEMERMAN & HOLSBERRY, LLP
595 Market Street, Suite 800
San Francisco, CA 94105
Telephone: (415) 597-7200
Fax: (415) 597-7201

MAURICE D. PESSAH, SBN 275955
maurice@pessahgroup.com
MICHELLE ESHAGHIAN, SBN 291688
meshaghian@pessahgroup.com (admission pending)
PESSAH LAW GROUP, PC
1801 Century Park East, 26th Floor
Los Angeles, CA  90067
Telephone: (310) 772-2261

Attorneys for Plaintiffs and Putative Class

COME NOW Plaintiffs Kevin Hogan, Shannon Currell, Dennis Russell, Ngoc Ly, Justin Harris, Alexander Polonsky, Brian Zaghi, Cheryl Stratemeyer, Jeremy Kahn, Mark Huddleston, and Brent Levinson for causes of action and allege as follows:

### INTRODUCTION TO THE CLAIMS

1.      Kevin Hogan, Shannon Currell, Dennis Russell, Ngoc Ly, Justin Harris, Alexander Polonsky, Brian Zaghi, Cheryl Stratemeyer, Jeremy Kahn, Mark Huddleston, and Brent Levinson (collectively, "**Named Plaintiffs**") were at all relevant times herein employed by WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A., and WELLS FARGO SECURITIES, LLC (collectively referred to as "**Wells Fargo**" or "**Defendants**").

2.      Over the past decade, Wells Fargo has implemented a fraudulent scheme to increase its stock price by aggressively setting sales goals which Wells Fargo knew to be unrealistic and impossible for employees to attain on a regular basis absent unethical, illegal, or fraudulent behavior ("Sales Misconduct").

3.      Wells Fargo had a stated goal of having 8 "solutions," or accounts, per customer, although the industry standard was 3 accounts per customer.  Wells Fargo's goal was arbitrarily determined at the highest level of the company, by the previous CEO, John Stumpf and executive Carrie Tolstedt.  Wells Fargo knew employees would need to engage in Sales Misconduct in order to meet this arbitrary and astronomical goal, including opening accounts for people who did not need them, did not want them, and possibly for people who did not exist.

4.      As an intended result of this scheme, Wells Fargo employees were trained, coerced, and required to open accounts and provide other services (called "solutions") that customers either did not want, objected to, had no knowledge of, and by any other means necessary in order to meet the unreasonable goals.  This resulted in the creation of over two million illegitimate accounts, an inflated "cross-sell" ratio and a soaring stock price.

5.      For over a decade, Wells Fargo has had actual knowledge that substantial Sales Misconduct existed. During that period, customers routinely contacted Wells Fargo to complain about unauthorized accounts; Wells Fargo employees regularly contacted the ethics

hotline to report and complain about widespread and egregious Sales Misconduct amongst fellow employees; and Wells Fargo employees sent letters and emails to senior executives, including Ms. Tolsted and Mr. Stumpf, reporting rampant Sales Misconduct.  In addition, Wells Fargo monitored employee computers, which showed Sales Misconduct such as: accounts being opened on January 1, a bank holiday; the creation of numerous unfunded accounts, frequent reopening of closed accounts, and the widespread existence of customer accounts in which the only account activity was incurring Wells Fargo fees; and accounts being opened by Wells Fargo employees with obviously and transparently false customer contact information, such as noname@wellsfargo.com.  During this time period, Wells Fargo also fired hundreds or thousands of employees each year who got caught engaging in "excessive" or "egregious" acts of Sales Misconduct.

6.      Despite being well aware of all the Sales Misconduct among its ranks, Wells Fargo placed no barriers or checks in place to prevent any acts of Sales Misconduct, not even the "excessive" or "egregious" Sales Misconduct.  Wells Fargo did not want to stifle *all* Sales Misconduct because cross-selling unwanted products was a necessary part of their "8 is great" campaign – a goal that was never based on the need for 8 products per customer.  Additionally the cross-selling was great for Wells Fargo's stock price.  Therefore, despite its knowledge of substantial Sales Misconduct due to existing goals, Wells Fargo decided to increase goals rather than to eliminate them completely or adopt other preventative measures.  Wells Fargo thus continued to coerce employees to generate as many solutions as possible and by any means necessary.

7.      In fact, employees who engaged in Sales Misconduct were promoted, given raises, bonuses, and other benefits of employment. Wells Fargo also systematically took adverse employment actions against ethical employees who refused to engage in Sales Misconduct to meet the unrealistic sales goals on a regular basis.  As a direct, retaliatory response to their refusal to engage in Sales Misconduct, these ethical employees were routinely counseled, warned, written up, demoted, placed on performance improvement plans, forced to quit, denied

HOGAN V. WELLS FARGO – COMPLAINT FOR DAMAGES

promotions, or fired as a result of not meeting sales goals, even though they could have easily met such goals by engaging in Sales Misconduct.

8.      By placing a continuous and inordinate amount of pressure upon employees who were not willing to engage in Sales Misconduct to either "play ball" or lose their livelihood – known at Wells Fargo as the "coach them up or coach them out" management strategy – Wells Fargo inflicted lasting and severe emotional distress on the employees who were not willing to engage in Sales Misconduct.  These employees endured a disturbingly untenable work environment – in effect, a psychological warzone.  As a direct, retaliatory response to their refusal to engage in Sales Misconduct, these ethical employees were routinely counseled, warned, demoted, forced to quit, passed up for promotions, or fired as a result of not meeting sales goals.

9.      Wells Fargo, even during the height of the scandal, chose to never tell its shareholders that millions of accounts that had been opened were illegitimate, phony, unwanted, and/or would never be used.  Instead, Wells Fargo persisted to pressure its employees to generate an unreasonably high volume of new solutions.  This fraudulent scheme was common to all aspects of Wells Fargo's business – retail, small business, mortgage, business, and brokerage.

10.     It is now widely accepted that Wells Fargo's aggressive cross-selling is one of the main reasons it has become one of the most valuable banks in the world.  Wells Fargo measures cross-selling by the number of different accounts a customers has with Wells Fargo.  In at least 12 conference calls, Wells Fargo CEO John Stumpf personally cited Wells Fargo's success at cross-selling retail accounts as one of the main reasons to buy more stock in the company – even though Wells Fargo knew that millions of the opened accounts were either illegally opened, unwanted, carried a zero balance, or were simply a result of the Sales Misconduct and the practices described below.  Wells Fargo knew that its unreasonable quotas were driving these unethical behaviors but kept them in place and turned a blind eye because the result was an increased stock price and benefit to the CEO at the expense of the low level employees. Wells Fargo's fraudulent scheme, which was set at the top and directed toward the bottom, was

1   to squeeze employees to the breaking point so they would cheat customers, allowing
2   management to drive up the value of Wells Fargo stock.

3   11.     Mr. Stumpf testified in front of Congress that Wells Fargo "should have realized earlier
4   that product sales goals could elicit behavior that is inconsistent with [Wells Fargo's] culture."
5   [Wells Fargo House Hearing 9.29.16] He also testified in front of Congress that Wells Fargo
6   will be discontinuing the sales goals and incentives for cross-selling.  [Wells Fargo House
7   Hearing 9.29.16]  Attached hereto as **Exhibit 1** is Wells Fargo's current policy, which states
8   that Wells Fargo has eliminated "product sales goals for all retail bankers to make sure nothing
9   get in the way of doing what is right."

10  12.     Despite publicly stating that it would fully compensate and make things right for their
11  customers, Wells Fargo has not decided to make things right for thousands of employees who
12  lost their jobs or otherwise suffered adverse employment actions and severe emotional distress
13  because they refused to engage in Sales Misconduct.

14  13.     After turning a blind eye to Sales Misconduct for a decade, Wells Fargo recently
15  acknowledged and agreed to correct the root of the problem by completely eliminating the
16  product sales goals that the Class Members were fired for not being able to ethically attain.  In
17  fact, Wells Fargo has also agreed to put safeguards and checks in place to prevent employees
18  from being pressured to open accounts due to concerns about losing their jobs.   These
19  corrective measures are inexpensive, obvious, and easy to implement, yet at all relevant times
20  throughout the Class Period, Wells Fargo declined to implement such measures.   Instead,
21  despite knowing that implementing such fixes would have solved the problem, Wells Fargo
22  continued to fire employees for failing to meet sales goals because, in reality, Wells Fargo
23  wanted its employees to continue to engage in Sales Misconduct as much and as long as
24  possible.

25  14.     Wells Fargo CEO, John Stumpf, testified under oath in front of Congress that
26  employees "should not be fired for missing sales goals." [Wells Fargo House Hearing 9.29.16]
27  However, Wells Fargo has in fact systematically fired, demoted, and forced many employees
28  to resign across the country for missing sales goals, and this systematic practice was well

1  known to Wells Fargo management. By firing and taking other adverse actions against

2  employees who refused to engage in Sales Misconduct, Wells Fargo sent an unmistakable

3  message to all of its employees: play ball or you're out.

4

5  ## JURISDICTION AND VENUE

6  15.    Venue is proper in the Northern District of California because Named Plaintiffs Kevin

7  Hogan, Shannon Currell, and Ngoc Ly are residents of the Northern District of California,

8  because Named Plaintiffs Kevin Hogan, Shannon Currell, and Ngoc Ly performed work for

9  Defendants within the Northern District of California and because Defendants regularly

10  conduct business within the Northern District of California.   Defendants own and operate

11  numerous facilities and employ numerous putative class members within the Northern District

12  of California.   More fundamentally, Defendants' liability to the Plaintiffs arose in substantial

13  part within the Northern District of California, where Wells Fargo is headquartered, and some

14  of the wrongful acts complained of occurred within the Northern District of California.

15  16.    Federal Question jurisdiction is raised by several of the causes of action alleged in this

16  complaint, and this Court has subject matter jurisdiction over such claims pursuant to 28

17  U.S.C. § 1331.  In addition, this Court has original jurisdiction over all of the state and federal

18  claims herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, upon

19  information and belief, the amount in controversy exceeds $5,000,000 and the parties are

20  citizens of diverse jurisdictions.  This Court also has supplemental jurisdiction over Plaintiffs'

21  state law claims pursuant to 28 U.S.C. § 1367.

22

23  ## PARTIES

24  17.    Named Plaintiffs worked for Wells Fargo at various times during the relevant time

25  period. Named Plaintiffs were told that they had to meet certain goals of "solutions."   Wells

26  Fargo knew that its "solutions" goals were unreachable and Wells Fargo knew and expected its

27  employees to reach such sales goals through the use of Sales Misconduct practices described

28  above.  As a result of Named Plaintiffs' opposition to Sales Misconduct, the Named Plaintiffs

were counseled, demoted, not-promoted and/ or later terminated or forced to resign.  Named Plaintiffs suffered both economic and non-economic damages including loss of income, back and front pay, and emotional distress.

18.    Defendant Wells Fargo & Company is, and at all times relevant hereto was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.  Wells Fargo & Company is a financial services company with $1.5 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 9,000 locations, 12,000 ATMs, and the Internet.  It has approximately 265,000 full-time employees, and is ranked 29th on Fortune Magazine's 2014 rankings of America's 500 largest corporations.

19.    Defendant Wells Fargo Bank, N.A. is, and at all times relevant hereto was, a national banking association chartered under the laws of the United States, with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, N.A., provides Wells Fargo & Company's personal and commercial banking services, and is Wells Fargo & Company's principal subsidiary.

20.    Defendant Wells Fargo Securities, LLC is a Delaware limited liability company which is the brokerage arm of Wells Fargo Bank, providing stock brokerage accounts and other brokerage services.

21.    Named Plaintiffs will ask leave of Court to amend this complaint to reflect the defendants' true names and capacities when the same have been ascertained if not correctly named as of yet.  Named Plaintiffs are informed and believe, and thereon allege, that each of said defendants are responsible, jointly and severally, for the events and injuries described herein and caused damages thereby to plaintiff as alleged herein.

22.    It further is alleged that defendants, each and together, at all times relevant hereto, constituted an "integrated enterprise" with interrelated operations, common management, centralized control of labor relations, and common ownership and/or financial control.

23.    On information and belief, it further is alleged that the defendants were at all times relevant hereto, the alter egos of each other such that to affirm the legal separateness of the

defendants for purposes of the claims presented in this action would lead to an injustice and/or inequitable result. There is a unity of interest and ownership between the company and its equitable owner(s) that the separate personalities of the company and its shareholders do not in reality exist. Defendants exhibit an interrelation of operations, commingling of funds, lack of observation of corporate formalities, undercapitalization, centralized control, common management, and common financial control such that they are an integrated enterprise and/or are alter egos. The company is a mere shell, instrumentality, and conduit through which the individual defendant(s) carried on their business, exercising complete control and dominance of such business to the extent that any individuality or separateness of the defendants does not and did not exist.

24.     Named Plaintiffs are informed and believe and thereon allege that at all times herein mentioned each of the defendants was acting as the partner, agent, servant, and employee of each of the remaining defendants, and in doing the things alleged herein was acting within the course and scope of such agency and with the knowledge of the remaining defendants.

25.     Named Plaintiffs do not know the true names or capacities of defendants sued herein as Does 1 through 50, inclusive and Named Plaintiffs sue these defendants by such fictitious names. Named Plaintiffs will seek to amend this Complaint and include these Doe Defendants' true names and capacities as soon as they can be reasonably ascertained. Doe Defendants may include other individuals holding an ownership interest in the Defendants' business. Doe Defendants may include other joint employer entities.

## **GENERAL ALLEGATIONS**

### **Wells Fargo Implemented a Nationwide, Fraudulent Sales Scheme**

26.     Wells Fargo aggressively incentivized illegal and unethical conduct by creating unrealistic sales goals that could not be met on a regular basis without engaging in some Sales Misconduct. Those Wells Fargo employees who refused to engage in some misconduct and thus failed to meet sales goals on a consistent basis suffered "**Adverse Employment Actions**" including, without limitation, the following: being issued written warnings, reprimands or other

notices indicating that their performance was not satisfactory; being placed on performance improvement plans; being demoted; being denied the opportunity for promotions and/or bonuses; being forced to resign and/or being terminated.  By taking Adverse Employment Actions against employees who failed to engage in some Sales Misconduct, Wells Fargo was able to coerce the remaining employees to engage in sufficient amounts of Sales Misconduct resulting in 2 million unwanted accounts.

27.     During this time period, Wells Fargo would boast about the average number of products held by its customers, currently approximately six bank accounts or financial products per customer. Despite already having knowledge of sales misconduct, Wells Fargo then sought to increase this to an average of eight bank accounts or financial products per account holder, a company goal that Wells Fargo lauded and called the "Gr-eight" initiative.

28.     Wells Fargo has adopted nationwide policies that have, predictably and naturally, pressured and encouraged bankers to engage in fraudulent, unfair, deceptive, illegal, and unethical behavior ("**Sales Misconduct**") in order to meet those unreachable goals or else face Adverse Employment Action, up to and including termination.

29.     Wells Fargo knew about and, through its companywide policies, encouraged Sales Misconduct for many years.  As a result, at least 2 million fraudulent accounts were opened across the U.S. over a five year period.[1]  Wells Fargo admits to firing over 5,300 employees who were caught engaging in Sales Misconduct.

30.     Wells Fargo's policy of requiring employees to meet sales goals through Sales Misconduct happened at each and every Wells Fargo branch without exception, because it was part and parcel of Wells Fargo's stated, nationwide sales policy and corporate culture.  *See* "Banker Assessment Presentation," attached hereto as **Exhibit 2** (internal memo highlighting

---

[1] On information and belief, this number does not represent the true number of accounts that were opened due to Sales Misconduct, such as accounts that were opened by misrepresenting Wells Fargo's polices about whether a customer really needed an account; opening accounts that were only opened for "meeting sales goals," and not for legitimate banking purposes; or for other, similar reasons.

1  Wells Fargo's policy mandating employees to open accounts regardless of customers'
2  objections).

3  31.    Indeed, with regard to employees who were not meeting their goals, the "catch-phrase"
4  mantra for management was "coach them up or coach them out" – in other words, supervisors
5  and management would severely turn up the pressure on employees to meet the sales goals via
6  warnings, meetings, and counseling sessions (coaching "up"), and if that had no effect would
7  then make it clear to the employees that they should look elsewhere for employment or they
8  would face the consequences of their "deficient" performance (coaching "out").

9  **The CFPB's Investigation Confirms Widespread Improper Sales Practices**

10  32.    This past September, the federal Consumer Financial Protection Bureau ("CFPB")
11  issued a Consent Order as a result of its investigation of Wells Fargo's sales practices, attached
12  hereto as **Exhibit 3** (the "**CFPB Consent Order**").   The CFPB concluded that Wells Fargo
13  had engaged in several "specific acts and practices" – namely, Wells Fargo had:

14
15    1. Opened unauthorized deposit accounts for existing customers and
       transferred funds to those accounts from their owners' other
       accounts, all without their customers' knowledge or consent;
16    2. Submitted applications for credit cards in consumers' names using
       consumers' information without their knowledge or consent;
17    3. Enrolled consumers in online-banking services that they did not
18       request; and
19    4. Ordered and activated debit cards using consumers' information
       without their knowledge or consent.

20  CFPB Consent Order at p. 1.  Furthermore, the CFPB found that "Thousands of [Wells
21  Fargo's] employees engaged in Improper Sales Practices to satisfy sales goals and earn
22  financial rewards under [Wells Fargo's] incentive-compensation program.   During the
23  Relevant Period [January 2011 through September 2016], Respondent terminated roughly
24  5,300 employees for engaging in Improper Sales Practices." CFPB Consent Order at p. 4, ¶ 9.[2]

25  _____
26  [2] The CFPB Consent Order defines Improper Sales Practices as "any of the following in the
    Community Bank Regional Bank Branch Network: (1) opening any account without the
    consumer's consent; (2) transferring funds between a consumer's accounts without the
27  consumer's consent; (3) applying for any credit card without the consumer's consent; (4)
    issuing any debit card without the consumer's consent; and (5) enrolling any consumer in
28  online-banking services without the consumer's consent."  CFPB Consent Order at p. 3, ¶ 3.f.

33.     As a result of its investigation, in addition to imposing an unprecedented $100 million dollar fine, the CFPB directed Wells Fargo to retain a specialized, independent consultant to review, among other matters, "whether Respondent's performance-management and sales goals for its employees are consistent with the objective of preventing Improper Sales Practices and other sales-integrity violations."  CFPB Consent Order at p. 12, ¶ 40.e.

34.     Wells Fargo's CEO has since apologized for the failure of the bank to prevent Sales Misconduct and has since agreed as a companywide measure to end its sales goals because Wells Fargo knew that taking Adverse Employment Actions against employees for failing to meet "sales goals" was in reality a way to get rid of employees who opposed Sales Misconduct.

35.     Yet, even though Wells Fargo's companywide policy was that employees should not have been fired for missing sales goals, Wells Fargo did take Adverse Employment Actions against thousands of employees who did not meet sales goals because they refused to engage in Sales Misconduct.  Wells Fargo now admits that firing employees who missed sales goals amounts to a de facto policy to fire employees who did not engage in Sales Misconduct.

### Employees Who Did Not Engage in Sales Misconduct

### Endured an Abusive and Untenable Work Environment

36.     Wells Fargo's resulting market dominance came at a significant price to employees who were not willing to engage in Sales Misconduct.  It was well known among those in charge for setting policy at Wells Fargo that it would be impossible for any Wells Fargo employee to meet the unrealistic goals on a consistent basis over a long period of time without resorting to some Sales Misconduct, as described further below.

37.     Wells Fargo compelled enforcement of its sales goals by taking Adverse Employment Actions against employees who did not engage in Sales Misconduct to meet their sales goals. Daily sales for each branch, and each sales employee, were reported and discussed by Wells Fargo's District Managers four times a day, at 11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m. Every employee was aware that some Sales Misconduct, also known as "gaming," was required in order to meet sales goals on a consistent basis.  Wells Fargo would look the other way as long as the Sales Misconduct was not excessive or abusive.  Those failing to meet daily

sales goals were approached by management and often reprimanded and/or told to "do whatever it takes" to meet their individual sales goals, conveying the message that the employee was not "gaming" enough.  Consequently, Wells Fargo's employees who did not engage in some Sales Misconduct to meet their goals were opposing such practices.

38.     Sales Misconduct consists of, among other things, opening and manipulating fee-generating customer accounts through often unfair, fraudulent, and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission or even over objections; opening solutions without the proper required authorizations; opening solutions by misrepresenting Wells Fargo's polices and informing a customer that a solution was necessary even though it really was not required; opening solutions for the sole purpose of "meeting sales goals" and not for legitimate banking purposes; and misrepresenting the costs, benefits, fees, and/or attendant services that come with an account or product, all in order to meet sales goals.

39.     Employees who failed to meet their sales goals were asked to work overtime without pay during "call nights" or they would be fired.  Fearing that they would lose their jobs, employees would also work through their meal and rest breaks to meet the astronomical sales goals.  Employees were not allowed to input hours beyond when their shift technically ended, nor were they allowed to input their hours worked through the meal and rest periods.  If employees did input their hours, the managers would go in and change them.  As such, the itemized statements and payroll stubs provided to employees at the end of each pay period were inaccurate and falsified.

40.     As a result of these policies, including the nationwide sales-goals scheme, the "pressure-cooker" sales culture, and the imposition of off-the-clock sessions for those who were not meeting their goals, many employees would make up accounts or engage in other Sales Misconduct so that they could leave work early or to avoid staying late.  Those who did not were eventually subjected to Adverse Employment Actions.

**The Sales-Goals Scheme Fostered Widespread Sales Misconduct**

41.      Sales Misconduct practices were so pervasive in Wells Fargo's business model that some methods were given their own names.   The following are examples of such Sales Misconduct practices:

     a.   "*Sandbagging*" refers to the practice of failing to open accounts when requested by customers, and instead accumulating a number of account applications to be opened at a later date.   Specifically, Wells Fargo employees would collect manual applications for various products, stockpile them in an unsecured fashion, and belatedly open up the accounts (often with additional, unauthorized accounts) in the next sales reporting period, frequently before or after banking hours, or on bank holidays such as New Year's Day.

     b.   "*Pinning*" refers to the practice of assigning, without customer authorization, Personal Identification Numbers ("PINs") to customer ATM card numbers with the intention of, among other things, impersonating customers on Wells Fargo computers, and enrolling those customers in online banking and online bill paying without their consent.

     c.   "*Bundling*" refers to Wells Fargo's practice of incorrectly informing customers that certain products are available only in packages with other products such as additional accounts, insurance, annuities, and retirement plans.

42.      Other common Sales Misconduct practices include:

     a.   Recommending customers open additional unneeded travel accounts (checking accounts that would be used while traveling) knowing full well that the only reason they were recommending these accounts was to meet sales goals.

     b.   Opening solutions by misrepresenting to customers that their accounts or cards had "expired" or because they needed "updated" information.

     c.   Requiring bankers to order debit cards for all accounts, even for those regarding which the customer specifically requested not to have a card.

d.  Creating accounts using fake customer information, usually from immigrants without driver's licenses, knowing that such accounts would never be used and eventually closed out.

e.  Using the bank's address for mailing of credit card offers so that employees could just destroy the offers before the customers knew they had been ordered on their accounts.

f.  Making misrepresentations to customers to induce them to open additional accounts, such as falsely stating that they would incur a monthly fee on their checking accounts until they added a savings account.

g.  Misrepresenting that additional accounts did not have monthly fees, when they actually did incur such fees.

h.  Referring unauthorized – and therefore unfunded – accounts to collections because Wells Fargo's practices caused the accounts to have negative balances.

i.  Targeting individuals holding Mexican Matriculada Consular cards because the lack of a Social Security Number made it easier to open numerous fraudulent accounts.  Wells Fargo employees would provide false information to complaining customers and advised many of these victims to ignore the unauthorized fees and letters from collection agencies, because the lack of a Social Security Number meant the debt would not affect them.

j.  Advising customers who did not want credit cards that they would be sent a credit card anyway, and to just tear it up when they receive it.

k.  Targeting older customers who were less aware that they were being taken advantage of.

l.  Targeting non-native English speaking customers who were less aware that they were being taken advantage of.

m.  Engaging in a "Jump into January" sales blitz where they would be told by upper management to get friends and family to open up 3rd, and 4th checking

accounts to obtain goals or stay late and make calls using "boiler room" sales tactics.

n. As instructed by management, falsely informing customers that each checking account automatically came with a savings account, credit card, or other product such as life insurance, and/or "Express Send" (an online program that allows customers to send money to foreign countries).

o. Opening two identical CD's when one would suffice.

p. Unnecessarily reissuing debit/credit cards (since that would technically count toward sales goals).

### Wells Fargo Required and Rewarded Sales Misconduct,

### While Punishing Employees who Refused to Advance its Fraudulent Scheme

43. Wells Fargo knew that its employees were engaging in Sales Misconduct to boost their sales numbers. For example:

a. Customers often entered Wells Fargo's branches to complain about unauthorized accounts; many victims even contacted Wells Fargo management by telephone.

b. Wells Fargo had access to, and frequently monitored, actions taken on its computers by employees. Wells Fargo was therefore put on notice of unusual activity indicative of Sales Misconduct, such as: numerous accounts being opened on January 1, a bank holiday; the creation of numerous unfunded accounts; frequent reopening of closed accounts; and the widespread existence of customer accounts in which the only account activity was incurring Wells Fargo fees;

c. Wells Fargo required that all new customer accounts be approved by a branch manager or assistant manager, thereby providing Wells Fargo management with a clear record of the number and types of accounts opened for each customer.

d.  Wells Fargo was also aware that its daily, weekly and monthly sales goals were unrealistic for employees to satisfy during normal working hours, since these sales goals generated numerous complaints and lawsuits by employees.

e.  Wells Fargo maintained an ethics hotline that received numerous complaints each year about the Sales Misconduct that Wells Fargo was pressuring its employees to engage in.

f.  Employees sent letters to senior executives warning them of such rampant practices and they simply ignored them.

g.  Online banking accounts were often opened by Wells Fargo employees with obviously and transparently false customer contact information, such as noname@wellsfargo.com.

h.  As early as 2013, the intense pressure to which Wells Fargo employees were being subjected was widely known and reported, as evidenced by the December 21, 2013, LA Times article "Wells Fargo's pressure-cooker sales culture comes at a cost," *available at* http://www.latimes.com/business/la-fi-wells-fargo-sale-pressure-20131222-story.html.   In that article, the LA Times reported: "The relentless pressure to sell has battered employee morale and led to ethical breaches, customer complaints and labor lawsuits, a Times investigation has found.   To meet quotas, employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork. Some employees begged family members to open ghost accounts."

44.    In fact, the drive to meet sales goals was so intense that Wells Fargo employees often found themselves compelled to pressure their own family members and friends to sign up for accounts to meet their quotas.  Some employees report that they "tapped out" every family member and friend for accounts.  These accounts were often referred to as "secret stash" accounts and would be opened and closed periodically to help satisfy the onerous sales-goal requirements.   Management encouraged employees to achieve "solutions" through family

1    members.  Since these accounts were opened by friends and family as favors, they were often

2    unfunded and could therefore result in fees charged by Wells Fargo to its own employees'

3    families or acquaintances, even for such "zero balance" accounts.

4    45.    By enacting and vigorously enforcing these sales goals, Wells Fargo pressured its

5    employees to engage in Sales Misconduct and rewarded those who did so.  Wells Fargo

6    encouraged Sales Misconduct and perpetuated the problem by promoting those who "gamed"

7    customers the most to positions of authority.  Worst of all, employees who did not engage in

8    Sales Misconduct were publicly shamed, demoted, denied promotions, forced to quit, and/or

9    terminated ("Coach them up, or coach them out").  Wells Fargo chose not to institute any

10   safeguards or corrections to make sure employees would no longer engage in Sales

11   Misconduct; rather, Wells Fargo simply fired the 5,300 employees who got caught and

12   continued to raise its already-astronomical sales goals.

13   46.    Wells Fargo required certain of the Named Plaintiffs to meet unrealistic sales goals by

14   committing some Sales Misconduct.  Certain of the Named Plaintiffs suffered Adverse

15   Employment Actions as a result of not meeting their sales goals because they opposed and

16   would not engage in any Sales Misconduct.

17   47.    It was only after Mr. Stumpf's testimony before Congress that former employees

18   became aware that the unethical practices that Wells Fargo was requiring them to engage in

19   was really part of a unified fraudulent scheme to defraud investors of Wells Fargo stock by

20   inflating the stock price with numbers from phony accounts.  For that reason, among others,

21   the statute of limitations should extend to all employees who were ever terminated as a result

22   of this fraudulent scheme.

23                              **Class and Subclass Definitions**

24   48.    The class of Plaintiffs covered by this case ("**Plaintiff Class**" or "**Class Members**") is

25   defined as all current and former Wells Fargo employees in the United States who were subject

26   to Wells Fargo's sales goals, and who were not terminated from employment with Wells Fargo

27   for engaging in Sales Misconduct.  The Plaintiff Class together with Named Plaintiffs are

28   hereinafter collectively referred to as ("**Plaintiffs**").

49.     Within the Plaintiff Class, the Named Plaintiffs also propose the following subclasses:

    a.  The RICO Subclass: all Class Members who suffered an Adverse Employment Action as a result of not satisfying Wells Fargo's sales goals.

    b.  The DFA Subclass: all Class Members who reported concerns about Sales Misconduct and subsequently suffered an Adverse Employment Action.

    c.  The FINRA Subclass: all Class Members who were terminated or constructively discharged for refusing to engage in, and/or reporting concerns about, Sales Misconduct, and for whom Wells Fargo filed an inaccurate and/or incomplete Form U5 (i.e., a Uniform Termination Notice for Securities Industry Registration) or similar document.

    d.  The California Subclass: all Class Members who were employed by Wells Fargo in California.

    e.  The California Refuser Subclass: all members of the California Subclass who suffered an Adverse Employment Action for refusing to engage in Sales Misconduct.

    f.  The California Reporter Subclass: all members of the California Subclass who suffered an Adverse Employment Action for reporting Sales Misconduct.

    g.  The California Wage Claim Subclass: all members of the California Subclass who were paid on an hourly, non-exempt basis and were forced to work off the clock without overtime compensation.

    h.  The California Waiting Penalty Subclass: all California Wage Claims Subclass members who are no longer employed by Wells Fargo.

50.     Named Plaintiffs bring this action on their own behalf, on behalf of the general public, and on behalf of all "aggrieved persons" and all other persons similarly situated within the Plaintiff Class of employees against whom Wells Fargo took unlawful adverse employment actions, including, retaliation, demotions, failure to promote, constructive discharge and/or termination within the United States at any time prior to the filing of this complaint and the date of entry of judgment after trial as further set forth below.

51.     Named Plaintiffs worked for Wells Fargo at various times during the relevant time period. Named Plaintiffs were told that they had to meet certain goals of "solutions."  Wells Fargo knew that its "solutions" goals were unreachable and Wells Fargo knew and expected its employees to reach such sales goals through the use of Sales Misconduct practices described above.  As a result of Named Plaintiffs' opposition to Sales Misconduct, the Named Plaintiffs were counseled, demoted, not-promoted and/ or later terminated or forced to resign.  Named Plaintiffs suffered both economic and non-economic damages including loss of income, back and front pay, and emotional distress.

52.     Defendants have taken Adverse Employment Actions against Plaintiffs for failing to meet sales goals.  In reality, Wells Fargo knew that Plaintiffs could only meet sales goals if they were engaging in Sales Misconduct, and Wells Fargo wanted its employees to do so.  Wells Fargo's stock price benefited significantly from the Sales Misconduct it coerced its employees to perform.  Despite intense pressure to perform, Plaintiffs refused to engage in Sales Misconduct and consequently suffered Adverse Employment Actions and severe emotional distress, as well as significant monetary damages.

53.     Wells Fargo stated in its 2014 Annual Report to the U.S. Securities Exchange Commission: "we continued to maintain our solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014)."  Wells Fargo further stated in that same filing: "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per household . . . ."

54.     In order to achieve its sales goals, Wells Fargo expected and trained its employees to meet sales goals through Sales Misconduct.  Sales Misconduct was part of Wells Fargo's policy and corporate culture.  Employees who did not reach their sales goals suffered Adverse Employment Actions and were regularly required to work hours beyond their typical work

schedule, off the clock and without proper compensation.  Employees who did not meet sales goals were also advised to resign or quit, because otherwise they would be fired.

55.     Plaintiffs could have easily met their sales goals if they engaged in Sales Misconduct as was expected of them.  Therefore, to encourage Sales Misconduct, Wells Fargo implemented its sales goals system.  As a result, when employees failed to engage in these behaviors, Wells Fargo retaliated against them by taking Adverse Employment Actions against them for not meeting their sales goals, giving them warnings, and making them choose between engaging in Sales Misconduct or being fired.

56.     The United States has strict laws against making false financial statements.

57.     Pursuant to the Gramm-Leach-Bliley Act, 15 United States Code section 6801, *et seq.*, and the rules and regulations promulgated thereunder, financial institutions have a duty to keep and protect the personal information of their customers from unauthorized access or misuse. When an "institution determines that misuse of its information has occurred or is reasonably possible, it should notify the affected customer as soon as possible. (70 Fed. Reg. 1575; 12 C.F.R. Part 30, App. B.)

58.     It is also illegal to engage in securities fraud by boosting stock prices as a result of conduct which one knows to be fraudulent, such as the scam perpetrated by Wells Fargo as stated above.

59.     Defendants are mandated by law to deter money laundering and assist in the identification of criminal activities, tax evasion and regulatory violation through the Bank Secrecy Act and Anti-Money Laundering (BSA/AML) as regulated by FinCEN (Financial Crimes Enforcement Network) under the United States Treasury

60.     Additionally the USA Patriot Act (The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism) added responsibilities to these laws requiring financial institutions to identify and deter international money laundering.

61.     The BSA/AML and the USA Patriot Act impose strict bank policy, adherence and oversight and, if violated, carry with them substantial civil and criminal penalties on the

financial institution, its employees, officers and directors.  Criminal penalties may include fines of $500,000 and ten years imprisonment.

62.     The BSA/AML requires that Defendants have a policy, procedure and practice to comply fully and completely with the letter and the spirit of the Bank Secrecy Act. Each officer and employee is expected to know the requirements of the Acts and the related rules and regulations affecting their responsibilities.

63.     Defendants declared via policy, training, and written acknowledgment that each employee has an affirmative duty to execute the requirements of the BSA/AML and USA Patriot Act in a manner that is consistent and in compliance with its policies and procedures.

64.     Under the BSA/AML and USA Patriot Act, financial institutions, including Defendants, are required to file a Suspicious Activity Report ("SAR") when they identify or suspect an activity that involves insider abuse, criminal violation or any violation of the Bank Secrecy Act. Financial institutions, including Defendants, are not required to establish probable cause or prove the illegal conduct before filing such a report. Financial institutions, including Defendants, must file a SAR when they have a substantial basis for identifying one of its directors, officers, employees, or agents as having committed or aided in the commission of a criminal act.

65.     Opening "solutions" which are not needed, not supported by documentation, fraudulent, fake, or not requested by the customer may be considered activity that requires a SAR.

66.     Furthermore, Defendants are a federally insured financial institution regulated by the Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation ("FDIC"), and the Federal Reserve Bank.

67.     Defendants' employees have an obligation to assure decisions by the bank, protect customer deposits, shareholder equity, the insurance fund of the FDIC, the general banking public, and to comply with banking rules and regulations.

68.     Opening "solutions" which are not needed, not supported by documentation, fraudulent, fake, or not requested by the customer may be considered activity that violates FDIC regulations.

69.     Section 1057 of the Dodd-Frank Act prohibits employers engaged in providing consumer financial products or services, and employers that provide a material service in connection with the provision of such products or services, from terminating or in any other way discriminating against a covered employee because the employee has (1) provided, caused to be provided, or is about to provide or cause to be provided, information relating to a violation of Title X of the Dodd-Frank Act or any other provision of law that is subject to the jurisdiction of the CFPB to the employer, the CFPB, or a state, local, or federal government authority or law enforcement agency; (2) testified or will testify in any proceeding resulting from the administration or enforcement of Title X of the Dodd-Frank Act or any other provision of law that is subject to the jurisdiction of the CFPB; (3) filed, instituted, or caused to be filed or instituted any proceeding under any federal consumer financial law; or (4) objected to or refused to participate in any activity that the employee reasonably believed to be in violation of any law subject to the jurisdiction of, or enforceable by, the CFPB.

70.     The FLSA prohibits employers from discharging or otherwise discriminating against an employee because such employee filed a complaint or instituted any proceeding under the statute, testified or is about to testify in any such proceeding, or served or is about to serve on an industry committee. Employers who willfully violate the FLSA's anti-retaliation provisions may be fined up to $10,000 and imprisoned up to six months. Employers who retaliate against employees in violation of this provision shall be liable for legal and equitable relief, including, without limitation, reinstatement, the payment of lost wages, and an additional equal amount as liquidated damages. An action may be maintained against any employer, including a public agency, in any federal or state court of competent jurisdiction by any one or more employees.

71.     Sarbanes-Oxley prohibits publicly traded companies from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee because such employee provided information, caused information to be provided, otherwise assisted in an investigation or filed, testified, or participated in a proceeding regarding any conduct that the employee reasonably believes is a violation of Sarbanes-Oxley, any SEC rule or regulation, or any federal statute relating to fraud against shareholders, when the information

or assistance is provided to a federal regulatory or law enforcement agency, any Member or committee of Congress, or a person with supervisory authority over the employee or investigative authority for the employer, regarding any violation of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), 1348 (securities fraud against shareholders), or any SEC rule or regulation, or of any federal law regarding fraud against shareholders.

## **CLASS ACTION ALLEGATIONS**

72.      Named Plaintiffs bring this action on their own behalf and on behalf of the Plaintiff Class set forth above.

73.      **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical.  The members of the class are so numerous that joinder of all members would be unfeasible and impractical.  Named Plaintiffs are informed and believe, and on that basis allege that there are well over 50 persons within the Plaintiff Class.   The identity of individuals qualifying for class membership is readily ascertainable via inspection of the personnel records and other documents maintained by Defendants.

74.      **Commonality and Predominance:** There are common questions of law and fact that predominate over any questions affecting only individual members of the class so that a class action is superior to other forms of action.  The claims of the Named Plaintiffs are typical of those of every other member of the Plaintiff Class.  All the Class Members were treated in a similar fashion and suffered similar harm as a consequence of Defendants' conduct, as alleged, and Defendants' demotion, forced resignation and/or termination of Named Plaintiffs for not achieving sales goals, which Defendants have since admitted was the mechanism by which employees were coerced to engage in unethical practices resulting in the fraud on the investors of Wells Fargo stock.  A subset of the Named Plaintiffs was also required to work overtime without pay in order to meet the unrealistic sales goals when they missed such targets during the ordinary course of business.

75.     For Named Plaintiffs and the Plaintiff Class, the common legal and factual questions include, but are not limited to the following:

**A. Common Factual Questions:**

1. Whether Wells Fargo implemented a common, nationwide scheme to impose unrealistic sales goals on its employees.

2. Whether Wells Fargo knew or should have known that, as a result of its sales-goals scheme, its employees were required to, and often did, engage in Sales Misconduct.

3. Whether Wells Fargo desired employees to engage in Sales Misconduct in order to meet sales goals.

4. Whether Wells Fargo's sales goals constituted a specific and biased procedure used to evaluate employees, in which those who did not engage in Sales Misconduct were prejudiced and suffered some Adverse Employment Actions.

5. Whether Plaintiffs suffered injury or damage as a result of Wells Fargo's common, nationwide scheme.

6. Whether Wells Fargo's common, nationwide scheme caused Plaintiffs to suffer Adverse Employment Actions.

7. Whether the sales practice of requiring employees to work off the clock, without compensation, to meet sales goals or be fired was a policy of Wells Fargo nationwide or only in specific branches.

**B. Common Legal Questions:**

1. Whether, by informing supervisors or the ethics hotline of Sales Misconduct, employees engaged in protected activity which entitled them to whistleblower protections under the Dodd-Frank Act.

2. Whether taking Adverse Employment Actions against whistleblowers for failure to engage in the very practices they were blowing the whistle on is, as a matter of law, a violation of the whistleblower protection of the Dodd-Frank Act.

3. Whether, as a result of Wells Fargo's misconduct, Plaintiffs are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

4. Whether the refusal by Plaintiffs to engage in Sales Misconduct constitutes protected activity.

76. **Typicality**: The Named Plaintiffs claims are typical of the claims of the members of the Class.  Plaintiffs and all the members of the class have been injured by the same wrongful practices of Wells Fargo.  Named Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the class and are based on the same legal theories.  Named Plaintiffs will fairly and adequately represent the interests of the Plaintiff Class because Named Plaintiffs are members of the class and Named Plaintiffs do not have an interest that is contrary to or in conflict with those of the Plaintiff Class.  There is a well-defined community of interest in the questions of law and fact affecting the class of persons that Named Plaintiff represents as a whole.  Each member of the Plaintiff Class was subjected to illegal practices of Defendants under SEC regulations, FLSA, the Dodd-Frank Act, and the Sarbanes-Oxley Act.

77. **Superiority:** A class action is superior to any other form of action for the fair and efficient adjudication of this lawsuit.  Individual employees such as Plaintiffs have a difficult time prosecuting an individual action against large corporate employers such as Defendants.  Even if any class member could afford individual litigation against Defendants, it would be unduly burdensome to the court system.  Individual litigation of such numerous claims magnifies the delay and expense to all parties and the court system.  By contrast, a class action presents far fewer management difficulties and affords the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.  Concentrating this litigation in one forum will promote judicial economy and parity among the claims of individual class members and judicial consistency in rulings.  Notice of the pendency and any resolution of this action can be efficiently provided to class members by mail, print, broadcast, internet, and/or multimedia publication.  Requiring each class member to both establish individual liability and pursue an individual remedy would discourage the assertion of lawful

claims by employees who would be disinclined to pursue an action against their present and/or former employer for fear of retaliation and permanent damage to their careers at present and/or subsequent employment.   Proof of a common business practice or factual pattern, of which the Named Plaintiffs experienced, is representative of the alleged class and will establish the right of each of the members of the alleged class to recovery on the claims alleged herein.

78.     The prosecution of separate actions by individual class members, even if possible, would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with respect to the individual class members against the defendants herein; and/or (b) legal determinations with respect to individual class members which would, as a practical matter, be dispositive of the other class members not parties to the adjudications or which would substantially impair or impede the ability of class members to protect their interests.  Further, the claims of the individual members of the class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses attending thereto. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

79.     **Adequacy:** Named Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Named Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

80.     Named Plaintiffs do not anticipate any difficulty in the management of this litigation.

81.     Wells Fargo has, or has access to, addresses and/or other contact information for the Class Members, which may be used for the purpose of providing notice of the pendency of this action.

82.     Named Plaintiffs request permission to amend the complaint to include other individuals as class representatives in the event that any of the Named Plaintiffs are deemed not to be an adequate representative of the Plaintiff Class. Named Plaintiffs further requests permission to amend the complaint to revise the Plaintiff Class definition as appropriate after discovery.

## COLLECTIVE ACTION ALLEGATIONS

83.     Named Plaintiffs bring this action on behalf of themselves and other employees similarly situated as authorized under the FLSA, 29 U.S.C. § 216(b). The employees similarly situated are:

**Collective Class:** all non-management employees in the United States who work or have worked for Wells Fargo within the maximum statutorily permitted time preceding the filing date of this complaint, were subject to Wells Fargo's sales goals, were paid on an hourly, non-exempt basis, and were not terminated from employment with Wells Fargo for engaging in Sales Misconduct.

84.     As further alleged above and below, as part of its fraudulent scheme, Wells Fargo suffered and permitted Named Plaintiffs and the Collective Class to work more than forty hours per week without appropriate overtime compensation.

85.     Defendants are liable under the FLSA for failing to properly compensate Plaintiffs and the Collective Class, and as such, notice should be sent to the Collective Class.   There are numerous similarly situated current and former employees of Defendants who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a Court-supervised notice of the present lawsuit and the opportunity to join in the present lawsuit. Those similarly-situated employees are known to Wells Fargo and are readily identifiable through Wells Fargo's records.

## FIRST CAUSE OF ACTION

### [Violation Of The Fair Labor Standards Act]

### On behalf of the FLSA Collective Class against all Defendants.

86.     Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

87.     Named Plaintiff Justin Harris consents in writing to be a party to this action, pursuant to 29 U.S.C. § 216(b).   Said Plaintiff's written consent form is attached hereto as **Exhibit 4**. Plaintiffs anticipate that other individuals will continue to sign consent forms and join as collective action plaintiffs.

88.    At all relevant times, Defendants have been, and continue to be, "employers" engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 203.  At all relevant times, Defendants have employed and continue to employ employees, including Named Plaintiffs and the Collective Class.  At all relevant times, Defendants have had gross operating revenues in excess of $500,000.

89.    The FLSA, 29 U.S.C. § 207, requires employers to pay non-exempt employees one and one-half times the regular rate of pay for all hours worked over forty (40) hours per workweek.

90.    Defendant suffered and permitted Plaintiff and the FLSA Collective to routinely work more than forty (40) hours a workweek without overtime compensation.

91.    Defendants required Plaintiff Harris and Collective Class members to work past closing and in excess of 8 hours a day to in order to satisfy their unrealistic sales goals.  Wells Fargo required these Plaintiffs to work off the clock to meet their goals or else be fired.  Wells Fargo did not pay these Plaintiffs for such work and required them to work off the clock in violating the FLSA.

92.    Defendant's actions, policies, and practices described above violate the FLSA's overtime requirement by regularly and repeatedly failing to compensate Plaintiff Harris and the FLSA Collective Class at the required overtime rate.

93.    As the direct and proximate result of Defendant's unlawful conduct, Plaintiff Harris and the FLSA Collective Class have suffered and will continue to suffer a loss of income and other damages. Plaintiff Harris and the FLSA Collective Class are entitled to liquidated damages and attorney's fees and costs incurred in connection with this claim.

94.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a). Defendant knew or showed reckless disregard for the fact that its compensation practices were in violation of these laws.

95.    In doing the things herein alleged, Defendants were guilty of oppression, fraud and malice in that they, among other things, acted with a willful and conscious disregard for Plaintiffs' rights, insofar as the things alleged were attributable to employees of Defendants, said employees were employed by Defendants with advance knowledge of the unfitness of the

employees and/or they were employed with a conscious disregard for the rights of others and/or Defendants authorized or ratified the wrongful conduct and/or there was advance knowledge, conscious disregard, authorization, ratification or act of oppression, fraud or malice on the part of an officer, director or managing agent of Defendants all entitling Plaintiffs to the recovery of exemplary and punitive damages.

## SECOND CAUSE OF ACTION

### [Violation of Dodd-Frank Act]

### On Behalf of the DFA Subclass against all Defendants

96.     Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

97.     During the relevant time period, DFA Subclass members and the Named Plaintiffs who are DFA Subclass members were and/or are employed by Defendants, and a subset of DFA Subclass members were, among other things, terminated or forced to resign under threat of termination in violation of Section 922 of the DFA.

98.     Pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(A):

a.  No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower--

i.  in providing information to the Commission in accordance with this section;

ii.  in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or

iii.  in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including

section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

99.     In 2011, the SEC issued final rules interpreting and implementing Section 21F of the Dodd-Frank Act.  At that time, the SEC issued Exchange Act Rule 21F-2(b)(1), which states that for the purpose of the whistleblower-protection program, "you are a whistleblower if . . . [y]ou provide information in a manner described in . . . 15 U.S.C. 78u-6(h)(1)(A)."  *See* 17 C.F.R. § 240.21F-2(b)(1).

100.    As described above, Section 78u-6(h)(1)(A) of the Dodd-Frank Act sets forth three types of protected whistleblower activity, the last of which – *i.e.*, subsection (iii) – includes making disclosures that are required or protected under the Sarbanes-Oxley Act.  *See* 15 U.S.C. § 78u-6(h)(1)(A)(iii)).   The Sarbanes-Oxley Act affords whistleblower protection to an employee who gives "information or assistance" to "a person with supervisory authority over the employee" or to any other "such person working for the employer who has the authority to investigate, discover, or terminate misconduct."  18 U.S.C. § 1514A(a)(1)(C).  That is, Sarbanes-Oxley protects employee disclosures made internally to certain supervisory personnel irrespective of whether the employee separately reports the information to the SEC.  Accordingly, since an individual is a "whistleblower if" they "provide information in a manner described in" subsection (iii) of section 78u-6(h)(1)(A), Rule 21F-2(b)(1) stipulates that the whistleblowing-protection program of the Dodd-Frank Act (DFA) does not require an employee to report violations directly to the SEC.  *See Somers v. Digital Realty Trust, Inc.*, 119 F. Supp. 3d 1088, 1094 (N.D. Cal. 2015); *see also Connolly v. Remkes* 2014 WL 5473144, at *5 (N.D.Cal. Oct. 28, 2014) ("a large majority of district courts … [found] ambiguity in the interplay between §§ 78u-6(a)(6) and 78u-6(h)(1)(A)(iii)."); *Murray v. UBS Securities, LLC*, No. 12 Civ. 5914 (JMF), 2013 WL 2190084 (S.D.N.Y. May 21, 2013); *Khazin v. TD Ameritrade Holding Corp.*, No. 13-4149, 2014 WL 940703, at *6 (D.N.J. Mar. 11, 2014); *Genberg v. Porter*, 935 F.Supp.2d 1094, 1106 (D.Colo. 2013); *Nollner v. S. Baptist Convention,* Inc., 852 F.Supp.2d 986, 993 (M.D.Tenn. 2012); *Kramer v. Trans-Lux Corp.*,

1  3:11CV1424 SRU, 2012 WL 4444820, at *4-5 (D.Conn. Sept. 25, 2012); *Egan v.*

2  *TradingScreen, Inc.*, 10 CIV. 8202 LBS, 2011 WL 1672066, at *5 (S.D.N.Y. May 4, 2011)).

3  101.    The DFA Subclass members and the Named Plaintiffs who are DFA Subclass members

4  either provided information, caused information to be provided, or otherwise assisted in an

5  investigation as such terms are defined in the Sarbanes Oxley Act to a person with supervisory

6  authority over the employee or any other person working for the employer who has the

7  authority to investigate, discover or terminate misconduct, or to the SEC.  18 U.S.C § 1514A.

8  102.    DFA Subclass members and the Named Plaintiffs who are DFA Subclass members

9  reasonably believed that Defendants' fraudulent scheme, including but not limited to the

10  rampant Sales Misconduct described above, was a possible securities law violation, violation

11  of any rules or regulations of the SEC, violated Federal laws relating to fraud against

12  shareholders, and/or was a possible violation of the provisions enumerated in Sarbanes-Oxley's

13  anti-retaliation provision set forth in 18 U.S.C. 1514A(a).  Named Plaintiffs and the Subclass

14  reported this information to the Defendants and/or to the SEC.

15  103.    In reporting their concerns regarding Defendants' fraudulent scheme, Named Plaintiffs

16  and the DFA Subclass acted in good faith.

17  104.    In reporting their concerns regarding Defendants' fraudulent scheme, Named Plaintiffs

18  and the DFA Subclass engaged in protected activity within the meaning of Section 922 of

19  Dodd-Frank.

20  105.    Accordingly, Named Plaintiffs and the DFA Subclass are whistleblowers within the

21  meaning of Section 922 of Dodd Frank or are otherwise afforded the protection of the anti-

22  retaliation provisions of that section.

23  106.    Defendants, who sought to avoid having their fraudulent scheme exposed, took Adverse

24  Employment Actions against Plaintiff and the DFA Subclass that were motivated by Plaintiff

25  and the DFA Subclass's protected activity.

26  107.    As a direct and proximate result of Defendants' unlawful Adverse Employment

27  Actions, Plaintiffs have suffered damages, including, but not limited to, lost past and future

28

wages and benefits and mental anguish and emotional suffering, all in an amount to be proven at trial and in excess of the jurisdictional minimum of this court.

108.    Pursuant to 15 U.S.C. § 78u-6(h)(1)(C), Plaintiffs are entitled to reinstatement with the same seniority status that such employees would have had, but for Defendants' discriminatory conduct, two times back pay, with interest, and litigation costs, expert witness fees, and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION

**[Violation of RICO, 18 U.S.C. § 1961 *et seq.*]**

**On behalf of the RICO Subclass against all Defendants**

109.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

110.    Defendants are enterprises within the meaning of 18 U.S.C. Sect. 1961(4).

111.    The activities of the Defendants affect interstate commerce.

112.    Defendants acquired and/or maintained control over said enterprises through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. Sect. 1962(b).

113.    Defendants, being associated with said enterprises, conducted and/or participated in said enterprises' affairs through a pattern of racketeering activities in violation of 18 U.S.C. Sect. 1962(c).

114.    The pattern of racketeering activities included a continuous pattern and practice involving all of the activities set forth in full factual detail herein, and involved, among other things, mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), fraud relating to financial institutions (18 U.S.C. § 1344), laundering of monetary instruments (18 U.S.C. § 1956) and/or securities fraud.

115.    Named Plaintiffs and RICO Subclass members were injured in the businesses and/or property by reason of the conduct set forth herein.

116.    Among other forms of injuries, Named Plaintiffs and RICO Subclass members lost employment, employment opportunities and the wages and other compensation associated with said employment and opportunities.

117.   Defendants have unlawfully engaged in the racketeering activities set forth herein and, on information and belief, on perhaps thousands of occasions during the past 10 years, through a pattern of racketeering activity, have acquired directly and indirectly control of the named enterprises, which have engaged in and whose activities affect interstate commerce.

118.   Defendants, who are either employed by or associated with those racketeering enterprises, have conducted those enterprises through a pattern of racketeering activity as set forth herein.

119.    Plaintiffs were injured in their business or property by reason thereof, and Named Plaintiffs and Class Members are entitled to damages, to be trebled, as well as to injunctive relief as set forth herein.

## FOURTH CAUSE OF ACTION

### [Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)]

### On behalf of the RICO Subclass against all Defendants

120.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

121.   Defendants unlawfully have conspired, as set forth herein, to violate the provisions of 18 U.S.C. § 1962(b), (c) and (d).

122.   Named Plaintiffs and RICO Subclass members were injured in their business or property by reason thereof, and are entitled to damages, to be trebled, as well as to injunctive relief as set forth herein.

## FIFTH CAUSE OF ACTION

### [Termination, Retaliation and Other Conduct in

### Violation of California *Labor Code* § 1102.5]

### On behalf of the California Reporter and

### Refuser Subclasses against all Defendants

123.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

124.     During the relevant time period, Named Plaintiffs and the members of the California Reporter and Refuser Subclasses were and/or are employed by Defendants, until those employees who were either terminated or forced to resign were ultimately discharged or resigned.

125.     In doing the things herein alleged, and as otherwise will be proven at trial, Defendants, and each of them, violated California Labor Code § 1102.5, which provides, in part, that:

> (a)  An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

> (b)  An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

> (c)  An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

> (d)  An employer may not retaliate against an employee for having exercised his or her rights under subdivision (a), (b), or (c) in any former employment.

126.     Defendants' fraudulent scheme not only invited, but required, employees who wanted to meet Defendants' aggressive sales goals to engage in Sales Misconduct.  Any Class Member

who had an Adverse Employment Action taken against him or her for not meeting sales goals was refusing to engage in Sales Misconduct. This is because any employee who engaged in Sales Misconduct would have met Wells Fargo's sales goals.

127. Plaintiffs and Subclass Members had a reasonable belief that participating in Defendants' scheme was illegal and/or fraudulent and therefore prohibited under either state or federal laws related to unlawful business practices, securities regulation, protection of customer information, among others.

128. By refusing to engage in the Sales Misconduct required by Defendants, Named Plaintiffs and Refuser Subclass Members refused to participate in Defendants' fraudulent scheme and, accordingly, failed to meet sales goals. The refusal to engage in Defendants' fraudulent scheme constituted protected activity pursuant to Labor Code § 1102.5(c).

129. Reporter Subclass members disclosed Defendants' fraudulent scheme either to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or provided information to a public body conducting an investigation, hearing, or inquiry. In making these reports regarding Defendants' fraudulent scheme, the Reporter Subclass had reasonable cause to believe that the information disclosed a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. Accordingly, Reporter Subclass Members engaged in protected activity pursuant to Labor Code § 1102.5(b).

130. Named Plaintiffs and Subclass Members had a reasonable belief that participating in Defendants' scheme was illegal and/or fraudulent and therefore prohibited under either state or federal law.

131. Defendants took Adverse Employment Actions against Subclass members who failed to meet sales goals, which was a direct result of Subclass Members' refusal to engage in the Sales Misconduct required by Defendants, and against Subclass Members who reported Sales

1  Misconduct.  Accordingly, the Adverse Employment Actions taken against Named Plaintiffs

2  and the Subclasses were a result of, and response to, their protected activity.

3  132.    Defendants, based on the totality of the circumstances, knew that Named Plaintiffs who

4  are part of the Refuser Subclass and the Refuser Subclass were not meeting sales goals, were

5  refusing to engage in Defendants' fraudulent scheme.  Defendants' Adverse Employment

6  Actions against these employees was due to the employees' refusal to engage in Sales

7  Misconduct.

8  133.    Defendants knew that Named Plaintiffs who are part of the Refuser Subclass and the

9  Refuser Subclass were reporting, or might report, unlawful Sales Misconduct.  Defendants'

10  Adverse Employment Actions against these employees was due to the employees' reporting of

11  Sales Misconduct.

12  134.    By taking Adverse Employment Actions against the Refuser and Reporter Subclasses

13  as a result of their refusal to engage in, and/or their reporting of, Sales Misconduct,

14  Defendants, and each of them, violated Labor Code § 1102.5.

15  135.    As a direct and proximate result of Defendants' conduct, Named Plaintiffs and Subclass

16  Members have suffered damages, including, but not limited to, lost past and future wages and

17  benefits and mental anguish and emotional suffering, all in an amount to be proven at trial and

18  in excess of the jurisdictional minimum of this court.

19  136.    In doing the things herein alleged, Defendants were guilty of oppression, fraud and

20  malice in that they, among other things, acted with a willful and conscious disregard for

21  Plaintiffs' rights, insofar as the things alleged were attributable to employees of Defendants,

22  said employees were employed with a conscious disregard for the rights of others and/or

23  Defendants authorized or ratified the wrongful conduct and/or there was advance knowledge,

24  conscious disregard, authorization, ratification or act of oppression, fraud or malice on the part

25  of an officer, director or managing agent of Defendants all entitling Plaintiffs to the recovery of

26  exemplary and punitive damages.

27  137.    Pursuant to 1102.5(f), Defendants are liable for a civil penalty not exceeding $10,000

28  for each violation of Labor Code § 1102.5.  Pursuant to Labor Code § 1103, a violation of

Labor Code § 1102.5 is a misdemeanor.   Pursuant to Labor Code § 1104, Defendants are responsible for the acts of its managers, officers, agents and employees.   Pursuant to Labor Code § 1105, Named Plaintiffs and the Subclasses may recover all damages from their employer for injury suffered through a violation of Labor Code § 1102.5.

## SIXTH CAUSE OF ACTION

**[Wrongful Termination, Suspension, Demotion, Failure to Promote,**

**Discrimination, and/or Constructive Termination in Violation of Public Policy]**

**On behalf of the California Reporter and Refuser Subclasses against all Defendants**

138.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

139.   During the relevant time period, Named Plaintiffs and the members of the California Reporter and Refuser Subclasses were and/or are employed by Defendants.

140.   Named Plaintiffs and the members of the California Reporter and Refuser Subclasses were, among other things, suspended, threatened, harassed, denied promotions, discriminated against, denied bonuses, discharged and forced to resign under threat of termination after Plaintiffs and Subclass Members failed to meet sales goals that Defendants knew could not be met in the absence of Sales Misconduct.

141.   There are numerous policies embodied in both state and federal statutes that are designed to protect the public from Defendants' fraudulent scheme, including Defendants' coercion of employees to engage in Sales Misconduct. These policies include, but are not limited to:

      a.   The Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 and 5536(a)(1)(B), which prohibits covered persons or service providers, including Defendants pursuant to 12 U.S.C. § 5481(6), from engaging in any unfair, deceptive, or abusive act or practice;

      b.   California Business and Professions Code Section 17200, which prohibits the use of any unlawful, unfair, or fraudulent business act or practice;

c. The Securities Exchange Act of 1934, 15 U.S.C. §78a et seq., and the regulations enacted pursuant thereto, which states that accurate reporting, protection of investors and maintaining the integrity of securities markets is a matter of public interest. Public policy concerns include the requirement that companies provide accurate disclosures of financial and operating information and prohibition of deceit, misrepresentation, fraud and insider profiteering.

d. 15 U.S.C. §78j prohibits the use of deceit and misrepresentation in securities transactions.

e. 15 U.S.C. §78t prohibits obstructing the filing of any report, prohibits trading in securities while in possession of material, nonpublic information and prohibits the aiding and abetting of these acts.

f. Relevant SEC Regulations under the Securities Exchange Act, 17 C.F.R. §240.0-1 et seq, which include: requirements for accurate reporting and prohibition of deceit, misrepresentation, fraud and insider profiteering. Section 240.13b2-1 prohibits falsifying or causing to be falsified any book, record or account, directly or indirectly. Section 240.10b-5 makes it unlawful for any person to employ any device, scheme or artifice to defraud; to make any untrue statement or omission of material fact; and to engage in any practice which operates as a fraud or deceit upon any person in connection with the purchase or sale of any security.

g. Provisions of the Sarbanes-Oxley Act of 2002, Title VIII, Section 806, (Corporate and Criminal Fraud Accountability Act of 2002), Pub.L. 107-204, Title VIII, § 806(a), July 30, 2002, 116 Stat. 802, codified at 18 U.S.C.A. § 1514A, and its implementing regulations. That statute and its implementing regulations, among other things, prohibits any publicly-traded company or 'any officer, employee . . . or agent of such company' from taking any action to 'discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee' who 'provide[s] information or cause[s]

information to be provided . . .regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to . . . a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).'

    h.   The Gramm-Leach-Bliley Act, 15 United States Code section 6801, *et seq.*, and the rules and regulations promulgated thereunder, which provide that financial institutions have a duty to keep and protect the personal information of their customers from unauthorized access or misuse.

142.    Under California law, it is axiomatic that employers may not discharge or take other adverse employment actions against employees who refuse to engage in, and/or report, an illegal, unethical, or fraudulent scheme.   This is embodied in, *inter alia*, the California Government Code, the California Code of Regulations, and was recognized as a common law tort in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 and its progeny.

143.    Defendants' fraudulent scheme implicated the numerous illegal, unethical policies and schemes described above, among others.

144.    Defendants took Adverse Employment Actions against Subclass members who refused to participate in Defendants' fraudulent scheme and/or reported Sales Misconduct. Specifically, Defendants took Adverse Employment Actions against Plaintiffs and the Refuser Subclasses for failing to meet sales goals, all while knowing that the only way to meet such goals was to engage in Sales Misconduct.   Defendants knew that employees who were failing to meet sales goals were refusing to participate in Defendants' fraudulent scheme.   In addition, Defendants took Adverse Employment Actions against Reporter Subclass members for reporting Sales Misconduct.   Accordingly, Defendants took Adverse Employment Actions against Plaintiffs and the California Refuser Subclass because of their refusal to participate in or otherwise advance Defendants' fraudulent scheme, and/or because of their decisions to

report Sales Misconduct.  Defendants' Adverse Employment Actions against Plaintiffs and the Subclasses contravened the numerous public policies delineated above.

145.   While Defendants terminated many Refuser Subclass members for their refusal to participate in Defendants' fraudulent scheme, other Subclass members were threatened that they would be terminated unless they could meet their sales goals.  These Subclass members knew that the only way to meet Defendants' sales goals was to engage in Sales Misconduct. Defendants' requirement that employees engage in Sales Misconduct – *i.e.*, to engage in unfair, unethical, illegal, and/or fraudulent practices – in order to reach their sales goals was so intolerable that no person in these Subclass members' position would have had any reasonable alternative except to resign.  Ultimately, these employees were forced to resign because they were unable to meet Defendants' sales goals in the absence of Sales Misconduct.

146.   As a direct and proximate result of Defendants' conduct, Plaintiffs and the California Reporter and Refuser Subclasses have suffered damages, including, but not limited to, lost past and future wages and benefits and mental anguish and emotional suffering, all in an amount to be proven at trial and in excess of the jurisdictional minimum of this court.

147.   In doing the things herein alleged, Defendants were guilty of oppression, fraud and malice in that they, among other things, acted with a willful and conscious disregard for Plaintiffs' rights, insofar as the things alleged were attributable to employees of Defendants, said employees were employed by Defendants with advance knowledge of the unfitness of the employees and/or they were employed with a conscious disregard for the rights of others and/or Defendants authorized or ratified the wrongful conduct and/or there was advance knowledge, conscious disregard, authorization, ratification or act of oppression, fraud or malice on the part of an officer, director or managing agent of Defendants all entitling Plaintiffs to the recovery of exemplary and punitive damages.

148.   The statute of limitations on the common law tort begins to run when an alleged adverse employment action acquires some degree of permanence or finality, which was not accomplished until Wells Fargo ended the sales goals which were given as the reason for each

HOGAN V. WELLS FARGO – COMPLAINT FOR DAMAGES

and every Plaintiff's Adverse Employment Action. *Richards v. CH2M Hill, Inc.* (2001) 26 Cal. 4th 798.

### SEVENTH CAUSE OF ACTION

**[Unfair Business Practices, Cal. Business and Professions Code § 17200, *et seq.*]**

**On behalf of the California Subclass against all Defendants**

149.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

150.   Section 17200 of the California Business and Professions Code – California's Unfair Competition Law – prohibits unfair competition by prohibiting, *inter alia*, any unlawful or unfair business acts or practices. The conduct by Defendants, as alleged herein, constitutes unlawful business actions and practices in violation of § 17200 *et seq.*

151.   Pursuant to Business and Professions Code § 17200 *et seq.*, Named Plaintiffs and the California Subclass members are entitled to: restitution of the overtime earnings and other unpaid wages and premiums alleged herein that Defendants have improperly withheld and retained during a period that commences four years prior to the filing of this action; a permanent injunction requiring Defendants to pay overtime and meal/rest premiums to all workers as defined herein; in California, an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5, and other applicable law; and costs.

### EIGHTH CAUSE OF ACTION

**[Breach of the Implied Covenant of Good Faith and Fair Dealing]**

**On behalf of the California Subclass against all Defendants**

152.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

153.   Into every contract, the laws of the State of California imply a covenant of good faith and fair dealing which requires that neither party shall do anything which will injure the right of the other party to receive the benefits of the agreement. Among other things, the covenant imposes upon each party the duty to refrain from doing anything which will render performance of the contract impossible by any act of his or her own, the duty to refrain from

1  doing anything to prevent or frustrate the performance of the contract by any other party, and

2  the duty to do everything that the contract presupposes he or she will do to accomplish the

3  purposes.

4  154.    Wells Fargo and Named Plaintiffs and members of the California Subclass entered into

5  employment contracts in which they were to be employed as at will employees of Wells Fargo

6  subject to Wells Fargo's personnel policies.   Pursuant to both the implied terms and express

7  terms of Wells Fargo's agreement to employ Named Plaintiffs and members of the California

8  Subclass, including Wells Fargo's written employment policies, Wells Fargo was required to

9  treat its employees fairly, with the expectation that employees would not be required to act

10 unlawfully and/or unethically in order to keep their jobs and succeed at Wells Fargo.

11 155.    In particular, the Wells Fargo Code of Ethics & Business Conduct, which was

12 distributed to Plaintiffs and members of the Plaintiff Class, indicates that employees "have a

13 responsibility to act with honesty and integrity."   The Code of Ethics & Business Conduct

14 further provides:  "We do what is right for our customers by:  Helping them make informed

15 financial choices and being honest and fair in our communications with them."   The Code also

16 instructs employees to "avoid conflicts of interest," which include situations where "Wells

17 Fargo's interests conflict with a customer's interest."   Moreover, the Code indicates that Wells

18 Fargo employees should "Deal fairly with our customers and others" and instructs employees

19 that they "must be honest and fair in our dealings with our customers. . .."  It further states that

20 "we are committed to making financial products and services available to [customers and

21 prospective customers] on a fair, transparent and consistent basis and conducting business in a

22 responsible manner."  The Code further instructs employees:

23          Always Remember:

24          •   Products provided to our customers should be in the
               customer's best interest, must be explained in a way that
25             the customer can understand, and the terms and conditions
               must be thoroughly and accurately outlined.

26          •   Steering a customer to an inappropriate or unnecessary
               product to receive sales credit may harm the customer and
27             is a violation of the Code . . .

28

HOGAN V. WELLS FARGO – COMPLAINT FOR DAMAGES

- Never engage in unfair, deceptive or abusive acts or practices

156.   Despite telling employees that they are expected to act honestly and in the customer's best interests at all times, Wells Fargo breached its promises and obligations to its employees and the covenant of good faith and fair dealing by committing the acts alleged herein including, without limitation: (1) establishing a fraudulent scheme designed to sell customers accounts which they did not want, need, or knew existed; (2) establishing sales goals for employees which Wells Fargo knew or should have known could not be readily met without employees engaging in unlawful, fraudulent and/or unethical conduct;  (3) concealing from Wells Fargo employees its knowledge that its sales scheme was unlawful and that its sales quotas were unlikely to be met unless employees engaged in fraud or other illegal or unethical acts; (4) misrepresenting to Plaintiffs and Wells Fargo employees the true purpose behind its fraudulent sales scheme; and  (5) preventing and frustrating Plaintiffs from carrying out their part of the employment agreement and impairing their rights to receive the benefits to which he was entitled pursuant thereto; (6) awarding bonuses and promotions to employees who regularly met sales goals, which Defendants knew or should have known was only possible by engaging in unlawful, fraudulent and/or unethical conduct at the expense of Defendants' customers.

157.   By the aforesaid acts and omissions of the Defendants, Named Plaintiffs and members of the California Subclass have been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings, loss of earning capacity, reliance damages, costs of suit and other pecuniary loss not presently ascertained, in an amount to be proved at trial.

## NINTH CAUSE OF ACTION

### [Intentional Infliction of Emotional Distress]

### On behalf of the California Subclass against all Defendants

158.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

159.   Defendants' conduct as described above was extreme and outrageous and was done with the intent of causing Named Plaintiffs and members of the California Subclass to suffer

1  emotional distress or with reckless disregard as to whether their conduct would cause them to

2  suffer such distress.

3  160.    By the aforesaid acts and omissions of Defendants, and each of them, Named Plaintiffs

4  and members of the California Subclass have been directly and legally caused to suffer actual

5  damages including, but not limited to, loss of earnings, attorneys' fees, costs of suit and other

6  pecuniary loss not presently ascertained.

7  161.    As a further direct and legal result of the acts and conduct of Defendants, and each of

8  them, as aforesaid, Named Plaintiffs and members of the California Subclass have been caused

9  to and did suffer severe mental and emotional distress.

10  162.    Named Plaintiffs and members of the California Subclass are informed and believe, and

11  thereon allege, that the Defendants, and each of them, by engaging in the aforementioned acts

12  and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional,

13  oppressive and despicable conduct, and acted with willful and conscious disregard of the

14  rights, welfare and safety of Plaintiff, thereby justifying the award of punitive and exemplary

15  damages in an amount to be determined at trial.

16  **TENTH CAUSE OF ACTION**

17  **[Negligent Infliction of Emotional Distress]**

18  **On behalf of the California Subclass against all Defendants**

19  163.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-

20  allege said allegations as if fully set forth herein.

21  164.    Named Plaintiffs and members of the California Subclass were owed a duty of due care

22  by Defendants, and each of them, to ensure that they were not exposed to foreseeable harms.

23  165.    Defendants, and each of them, knew, or should have known, that Named Plaintiffs and

24  members of the California Subclass were being, or would be, subjected to the conduct as

25  alleged herein, and knew, or should have known, that subjecting Named Plaintiffs and

26  members of the California Subclass to such conduct and/or failing to exercise due care to

27  prevent any other employee, agent, or supervisor from engaging in such conduct, could and

28  would cause Plaintiffs to suffer severe emotional distress.

166.    Defendants, and each of them, breached their duty of due care by engaging in such conduct and/or to prevent such conduct from occurring, and by failing to take appropriate corrective action following such conduct.

167.    As a direct and proximate result of the acts and conduct of Defendants, and each of them, as aforesaid, Named Plaintiffs and members of the California Subclass has been caused to and did suffer severe and extreme mental and emotional distress.

168.    By the aforesaid acts and omissions of Defendants, and each of them, Plaintiffs have been directly and legally caused to suffer damages as alleged herein.

**ELEVENTH CAUSE OF ACTION**

**[Failure to Pay Overtime Compensation, Cal. Labor Code § 1194]**

**On Behalf of the California Wage Claim Subclass against all Defendants**

169.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

170.    At all relevant times, California Labor Code § 510 required employers, like Wells Fargo, to pay overtime premiums for hours worked in excess of 8 in a given workday, 40 in a given workweek, or on the seventh day worked in a single workweek.

171.    Named Plaintiffs are informed and believe, and thereon allege, that members of the California Wage Claim Subclass worked in excess of eight hours per day and in excess of 40 hours per week, and Defendants unlawfully failed to pay members of the Class the proper overtime compensation required.  Pursuant to California Labor Code § 1194, Plaintiffs and the other Class members are entitled to recover their unpaid overtime compensation.

172.    As a direct and proximate result of Defendants' unlawful conduct, as set forth herein, Plaintiffs and the California Wage Claim Subclass have sustained damages, including loss of earnings for hours of overtime worked on behalf of Defendants, in an amount to be established at trial, plus damages, interest, attorneys' fees and costs.

**TWELFTH CAUSE OF ACTION**

**[Failure to Provide and/or Authorize Meal and**

**Rest Periods, Cal. Labor Code §§ 512, 226.7]**

**On Behalf of the California Subclass against all Defendants**

173.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

174.    California Labor Code § 512 prohibits an employer from employing an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, or for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes.

175.    California Labor Code § 226.7 prohibits any employer from requiring any employee to work during any meal or rest period mandated by an applicable IWC wage order, and provides that an employer that fails to provide an employee with a required rest break or meal period shall pay that employee one additional hour of pay at the employee's regular rate of compensation for each work day that the employer does not provide a compliant meal or rest period.

176.    Defendants failed to provide Plaintiffs and California Subclass members with meal periods as required by law, and failed to authorize and permit the Plaintiffs and California Subclass members to take rest periods as required by law.

177.    Plaintiffs and the California Subclass members are therefore entitled to payment of the meal and rest period premiums as provided by law.  Additionally, pursuant to Code of Civil Procedure § 1021.5, Plaintiffs and the California Subclass are entitled to attorneys' fees and costs.

**THIRTEENTH CAUSE OF ACTION**

**[Late Pay and Waiting Time Penalties, Cal. Labor Code § 203]**

**On Behalf of the California Waiting Penalty Subclass against all Defendants**

178.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

179.    California Labor Code §§ 201 and 202 require an employer to pay its employees all wages due within the time specified by law. Labor Code § 203 provides that if an employer willfully fails to pay such wages, the employer must continue to pay the subject employees' wages until the back wages are paid in full or an action is commenced, up to a maximum of thirty days of wages.

180.    Named Plaintiffs that are part of the Waiting Penalty Subclass together with the Waiting Penalty Subclass are entitled to unpaid compensation, but to date have not received such compensation.

181.    More than thirty days have passed since said Plaintiffs and Subclass members left Defendants' employ.

182.    Defendants willfully failed to pay said Plaintiffs and Subclass members any overtime or any meal or rest period premiums.

183.    As a consequence of Defendants' willful failure to timely compensate said Plaintiffs and Subclass members for all hours worked, Plaintiffs and Subclass members whose employment ended during the Class Period are entitled to thirty days' wages under Labor Code § 203, together with interest thereon and attorneys' fees and costs.

**FOURTEENTH CAUSE OF ACTION**

**[Failure to Provide Itemized Wage Statements, Cal. Labor Code § 226]**

**On Behalf of the California Wage Claim Subclass against all Defendants**

184.    Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

185.    Wells Fargo failed to provide Named Plaintiffs and members of the California Subclass with accurate itemized statements as required by California Labor Code § 226.  In particular,

Plaintiffs are informed and believe and thereon allege that Wells Fargo knowingly and intentionally did not state on Plaintiffs' and California Wage Claim Subclass members' payroll records the correct amount of overtime they had earned for having worked in excess of eight (8) hours per day, (12) hours per day and/or 40 hours per week.

186.   Named Plaintiffs are informed and believe, and thereon allege that Wells Fargo knowingly and intentionally failed to provide Plaintiffs and California Wage Claim Subclass members with accurate payroll records.  As a result, Plaintiffs and California Wage Claim Subclass members are entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and are entitled to an award of costs and reasonable attorney fees.

**FIFTEENTH CAUSE OF ACTION**

**[Declaratory Relief, Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202]**

**On Behalf of the FINRA Subclass against all Defendants**

187.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

188.   Numerous Wells Fargo subsidiaries which employed Named Plaintiffs and Class Members are members of the Financial Industry Regulatory Authority ("FINRA") and are required under FINRA regulations to file a "Form U5" within 30 days after a FINRA registered representative leaves his or her firm, which includes reasons for the employee's separation. FINRA requires that Form U5s be "timely, complete and accurate."  Moreover, member firms are required to file amended Form U5s whenever they learn of facts or circumstances which make a previously filed form U5 inaccurate or incomplete."

189.   Named Plaintiffs are informed and believe and thereon allege that Defendants caused false and/or inaccurate Form U5s to be filed for employees who were fired for not meeting Wells Fargo's unrealistic sales goals and/or for reporting Wells Fargo's unlawful practices. These false and defamatory Form U5 reports submitted by Wells Fargo have caused injury to

those Wells Fargo employees who were fired for failing to meet their sales goals and/or for protesting unlawful practices, including adversely affecting their reputations and ability to find future employment, among other things.

190.   For reasons including but not limited to those stated herein, an actual dispute exists between Plaintiffs and Defendants, in which parties have genuine and opposing interests, in which interests are direct and substantial, and of which a judicial determination will be final and conclusive.

191.   Named Plaintiffs and FINRA Subclass members are, therefore, entitled to a declaratory judgment that the Form U5 Forms submitted by Defendants in connection with those employees who left the employ of Wells Fargo for failing to meet their sales goals or for protesting illegal activity are false, inaccurate and incomplete, as well as such other and further relief as may follow from the entry of such a declaratory judgment.

**SIXTEENTH CAUSE OF ACTION**

**[Injunctive Relief]**

**On Behalf of the FINRA Subclass against all Defendants**

192.   Named Plaintiffs hereby incorporate each and every allegation contained above, and re-allege said allegations as if fully set forth herein.

193.   Named Plaintiffs are informed and believe and thereon allege that Defendants have refused to file amended Form U5s for those former employees whose employment with Wells Fargo ended because of failing to meet their sales goals or for protesting unlawful activity.

194.   Named Plaintiffs and FINRA Subclass members face real and immediate threat of irreparable injury and continuing, present adverse effects, as a result of Defendants' filing of false and defamatory Form U5s and of Defendants' refusal to file amended Form U5s for those former employees who left Wells Fargo's employ for failing to meet their sales goals or for protesting unlawful activity.

195.   Named Plaintiffs and FINRA Subclass members have no adequate or complete remedy at law.

196.     Named Plaintiffs and FINRA Subclass members are entitled to injunctive relief, including an order requiring Defendants to file amended Form U5s for those former employees who left Wells Fargo's employment for failing to meet their sales goals or for protesting unlawful activity.

///

///

1  WHEREFORE, Plaintiffs pray for relief as set forth below.

2

3  <u>**PRAYER FOR JUDGMENT**</u>

4  Named Plaintiffs pray for judgment as follows:

5  1.      General, compensatory, and statutory damages in amounts to be proven at trial,

6  including the recovery of two times back pay for violations of the Dodd-Frank Act and treble

7  damages for the violations of RICO;

8  2.      For punitive damages according to proof at trial;

9  3.      For declaratory and injunctive relief;

10  4.      For reinstatement of eligible members of the DFA Subclass;

11  5.      For reasonable attorneys' fees, expert witness fees, and other litigation expenses;

12  6.      For costs of suit;

13  7.      For such other relief as the Court deems just and proper; and

14  8.      Total damages according to proof at trial.

15

16  Dated: December 27, 2016

17                                                          LAW OFFICES OF JONATHAN J.
                                                           DELSHAD, PC.

18                                                          SCHONBRUN SEPLOW HARRIS &
                                                           HOFFMAN LLP

19                                                          MCCRACKEN, STEMERMAN &
                                                           HOLSBERRY, LLP

20                                                          PESSAH LAW GROUP, PC

21

22                                                           _/s Benjamin Schonbrun_____

23                                                          By:  Benjamin Schonbrun
                                                           Attorneys for Plaintiffs and Putative Class

24

25

26

27

28

1

**DEMAND FOR JURY TRIAL**

2

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs, individually

3

and on behalf of all others similarly situated, demand a trial by jury.

4

5

Dated: December 27, 2016

6

LAW OFFICES OF JONATHAN J. DELSHAD, PC.

7

SCHONBRUN SEPLOW HARRIS & HOFFMAN LLP

8

MCCRACKEN, STEMERMAN & HOLSBERRY, LLP

9

PESSAH LAW GROUP, PC

10

11

_/s Benjamin Schonbrun_

12

By:  Benjamin Schonbrun
Attorneys for Plaintiffs and Putative Class

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

HOGAN V. WELLS FARGO – COMPLAINT FOR DAMAGES



About Wells Fargo   News Releases   2016

**Wells Fargo Chairman and CEO John Stumpf Outlines a Series of New Actions to Strengthen Culture and Rebuild Trust of Customers and Team Members at Senate Banking Committee Hearing**

# Wells Fargo Chairman and CEO John Stumpf Outlines a Series of New Actions to Strengthen Culture and Rebuild Trust of Customers and Team Members at Senate Banking Committee Hearing

## Accepts Accountability for Wrongful Sales Practices

Washington, D.C., September 20, 2016

In testimony today before the U.S. Senate Banking Committee on Banking, Housing, and Urban Affairs, Wells Fargo & Company (NYSE: WFC) Chairman and Chief Executive John Stumpf addressed the wrongful sales practices that have taken place in the company's retail banking business, outlined the actions to eliminate them, and emphasized the company's commitment to rebuild trust going forward.

 "I accept full responsibility for all unethical sales practices in our retail banking business, and I am fully committed to fixing this issue, strengthening our culture, and taking the necessary actions to restore our customers' trust," Stumpf said.

"I want to make it very clear that we never directed nor wanted our team members to provide products and services to customers that they did not need or want. That is not good for our customers, and it is not good for our business. It is against everything we stand for as a company."

Stumpf said the Wells Fargo Board is actively engaged on this issue. "The Board has the tools to hold senior leadership accountable, including me and Carrie Tolstedt, the former head of our retail banking business."

He noted that any Board actions taken with named executive officers will be appropriately disclosed. Stumpf added, "I want to be clear on this: I will respect and accept the decision of the Board."

In his testimony, Stumpf also outlined key actions to ensure its culture is wholly aligned with the interests of its customers, including:

   Ending product sales goals for everyone in the retail banking business to make certain nothing gets in the way of doing what is right for customers;

   Sending customers a confirmation email within one hour of opening any deposit account and an acknowledgement letter after submitting a credit card application;

   Contacting all deposit customers across the country, including those who have already received refunded fees, to invite them to review their accounts with their banker and calling the credit card customers identified in the review to confirm whether they need or want their credit card;

   Expanding the scope of its customer account review and remediation to include 2009 and 2010;

   Conducting an independent, enterprise-wide review of our sales practices.

"I am making a personal commitment to rebuilding our customers' and investors' trust, the faith of our team members, and the confidence of the American people," Stumpf said.

Stumpf's full testimony is available at [www.wellsfargo.com/commitment](http://www.wellsfargo.com/commitment).

## About Wells Fargo

Wells Fargo & Company (NYSE: WFC) is a diversified, community-based financial services company with $1.9 trillion in assets. Founded in 1852 and headquartered in San Francisco, Wells Fargo provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 8,600 locations, 13,000 ATMs, the internet (wellsfargo.com) and mobile banking, and has offices in 36 countries and territories to support customers who conduct business in the global economy. With approximately 268,000 team members, Wells Fargo serves one in three households in the United States. Wells Fargo & Company was ranked No. 27 on Fortune's 2016 rankings of America's largest corporations. Wells Fargo's vision is to satisfy our customers' financial needs and help them succeed financially. Wells Fargo perspectives are also available at Wells Fargo Blogs and Wells Fargo Stories.

## Media

Mary Eshet
**704-383-7777**
Mary.Eshet@wellsfargo.com

## Media

Jennifer Dunn
**202-303-2966**
Jennifer.G.Dunn@wellsfargo.com

**Investors**

Jim Rowe

**415-396-8216**

Jim.Rowe@wellsfargo.com

Related topics: News Releases

© 1999 - 2016 Wells Fargo. All rights reserved. NMLSR ID 399801

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

HOGAN V. WELLS FARGO – COMPLAINT FOR DAMAGES



*Wells Fargo Recruiting*

# Banker Assessment Presentation

---

Purpose of the "Sell Our Products" Activity:

As a Personal Banker in our stores, you will be responsible for selling various banking products to customers (both existing customers and new customers).  It is important as a Personal Banker not only to know our products but also to be able to voice the benefits they provide.  In doing so, you will be able to provide the best service to our customers by offering products that best fits their financial needs.  In addition to this, being able to address and overcome customer objections is important.

Presentation Guidelines:

The following are instructions on what to do and what to expect for the presentation portion of your interview.  The 5-7 minute presentation will be given standing up in front of Wells Fargo managers.  Please feel free to enrich the presentation with the use of visual aids, brochures, handouts, etc.  Additionally, there may be questions from the managers regarding your presentation.

Instructions:

1.  Go to the www.wellsfargo.com website and/or visit any of our local stores to pick up information from the displays and learn about the different products and services Wells Fargo offers.

2.  Review and learn about our products and services.

3.  Select three banking products (e.g. Checking, Savings, Online Banking, Bill Pay, Equity loans/lines, etc.) that you will research in further detail to decide how to sell.

4.  Prepare a 5-7 minute (max) presentation on how you would go about selling these three banking products to a new customer. Include in this presentation details on how you would overcome objections from a potential customer who is currently banking with another financial institution and is receiving a product, service or benefit from our competitor that we don't offer.

Together we'll go far



---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

**UNITED STATES OF AMERICA**
**CONSUMER FINANCIAL PROTECTION BUREAU**

**ADMINISTRATIVE PROCEEDING**
**2016-CFPB-0015**

| | |
|---|---|
| **In the Matter of:**<br><br><br>**WELLS FARGO BANK, N.A.** | **CONSENT ORDER** |

The Consumer Financial Protection Bureau (Bureau) has reviewed the sales practices of Wells Fargo Bank, N.A. (Respondent, as defined below) and determined that it has engaged in the following acts and practices: (1) opened unauthorized deposit accounts for existing customers and transferred funds to those accounts from their owners' other accounts, all without their customers' knowledge or consent; (2) submitted applications for credit cards in consumers' names using consumers' information without their knowledge or consent; (3) enrolled consumers in online-banking services that they did not request; and (4) ordered and activated debit cards using consumers' information without their knowledge or consent. The Bureau has concluded that such acts violate §§ 1031 and 1036(a)(1)(B) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531 and 5536(a)(1)(B). Under §§ 1053 and 1055 of CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

# I
# Jurisdiction

1.     The Bureau has jurisdiction over this matter under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

# II
# Stipulation

2.     Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order" (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under §§ 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying the findings of facts and conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

# III
# Definitions

3.     The following definitions apply to this Consent Order:

a.     "**Affected Consumers**" means any consumer subjected to any of the Improper Sales Practices.

b.     "**Board**" means Respondent's duly-elected and acting Board of Directors.

c.     "**California Enforcement Action**" means the lawsuit styled *People v. Wells Fargo & Co., et al.*, Los Angeles Superior Court, Case No. BC580778, filed by the Office of the Los Angeles City Attorney.

d.     "**Community Bank Regional Bank Branch Network**" means the Respondent's retail-branch operations within Respondent's Regional Bank group.

e.      "**Effective Date**" means the date on which this Order is issued.

f.      "**Improper Sales Practices**" means any of the following in the Community Bank Regional Bank Branch Network:

(1)      opening any account without the consumer's consent;

(2)      transferring funds between a consumer's accounts without the consumer's consent;

(3)      applying for any credit card without the consumer's consent;

(4)      issuing any debit card without the consumer's consent; and

(5)      enrolling any consumer in online-banking services without the consumer's consent.

g.      "**Los Angeles City Attorney**" means the Office of the Los Angeles City Attorney.

h.      "**Regional Director**" means the Regional Director for the West Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

i.      "**Related Consumer Action**" means a private action by or on behalf of one or more consumers or an enforcement action by a governmental agency other than the California Enforcement Action, brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

j.      "**Relevant Period**" includes the period from January 1, 2011, to the Effective Date.

k.      "**Respondent**" means Wells Fargo Bank, N.A. and its successors and assigns.

**IV**
**Bureau Findings and Conclusions**

The Bureau finds the following:

4.      Respondent is a national bank headquartered in Sioux Falls, South Dakota. Respondent is an insured depository institution with assets greater than $10 billion within the meaning of 12 U.S.C. § 5515(a).

5.      Respondent is a "covered person" under 12 U.S.C. § 5481(6).

6.      During the Relevant Period, Respondent offered a broad array of consumer financial products and services, including mortgages, savings and checking accounts, credit cards, debit and ATM cards, and online-banking services.

7.      Respondent sought to distinguish itself in the marketplace as a leader in "cross-selling" banking products and services to its existing customers.

8.      Respondent set sales goals and implemented sales incentives, including an incentive-compensation program, in part to increase the number of banking products and services that its employees sold to its customers.

9.      Thousands of Respondent's employees engaged in Improper Sales Practices to satisfy sales goals and earn financial rewards under Respondent's incentive-compensation program. During the Relevant Period, Respondent terminated roughly 5,300 employees for engaging in Improper Sales Practices.

10.     Respondent's employees engaged in "simulated funding." To qualify for incentives that rewarded bankers for opening new accounts that were funded shortly after opening, Respondent's employees opened deposit accounts without consumers' knowledge or consent and then transferred funds from consumers' authorized accounts

to temporarily fund the unauthorized accounts in a manner sufficient for the employee to obtain credit under the incentive-compensation program.

11.     Respondent's employees submitted applications for and obtained credit cards for consumers without the consumers' knowledge or consent.

12.     Respondent's employees used email addresses not belonging to consumers to enroll consumers in online-banking services without their knowledge or consent.

13.     Respondent's employees requested debit cards and created personal identification numbers (PINs) to activate them without the consumer's knowledge or consent.

14.     During the Relevant Period, Respondent's employees opened hundreds of thousands of unauthorized deposit accounts and applied for tens of thousands of credit cards for consumers without consumers' knowledge or consent.

15.     Respondent has performed an analysis to assess the scope of Improper Sales Practices that occurred between May 2011 and July 2015, including the number of potential instances of such practices.

### Findings and Conclusions as to
### Unauthorized Deposit Accounts & Simulated Funding

16.     Respondent's analysis concluded that its employees opened 1,534,280 deposit accounts that may not have been authorized and that may have been funded through simulated funding, or transferring funds from consumers' existing accounts without their knowledge or consent. That analysis determined that roughly 85,000 of those accounts incurred about $2 million in fees, which Respondent is in the process of refunding. The fees included overdraft fees on linked accounts the consumers already

had, monthly service fees imposed for failure to keep a minimum balance in the unauthorized account, and other fees.

17.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

18.    By opening unauthorized deposit accounts and engaging in acts of simulated funding, Respondent caused and was likely to cause substantial injury to consumers that was not reasonably avoidable, because it occurred without consumers' knowledge, and was not outweighed by countervailing benefits to consumers or to competition.

19.    Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1). Additionally, an act or practice is abusive if it takes unreasonable advantage of the inability of the consumer to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

20.    Respondent's acts of opening unauthorized deposit accounts and engaging in simulated funding materially interfered with the ability of consumers to understand a term or condition of a consumer financial product or service, as they had no or limited knowledge of those terms and conditions, including associated fees.

21.    Additionally, Respondent's acts of opening unauthorized deposit accounts and engaging in simulated funding took unreasonable advantage of consumers' inability

to protect their interests in selecting or using consumer financial products or services, including interests in having an account opened only after affirmative agreement, protecting themselves from security and other risks, and avoiding associated fees.

22.    Therefore, Respondent engaged in "unfair" and "abusive" acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B).

## Findings and Conclusions as to Unauthorized Credit Cards

23.    Respondent's analysis concluded that its employees submitted applications for 565,443 credit-card accounts that may not have been authorized by using consumers' information without their knowledge or consent. That analysis determined that roughly 14,000 of those accounts incurred $403,145 in fees, which Respondent is in the process of refunding. Fees incurred by consumers on such accounts included annual fees and overdraft-protection fees, as well as associated finance or interest charges and other late fees.

24.    Section 1036(a)(1)(B) of the CFPA prohibits "unfair" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

25.    By applying for and opening credit-card accounts using consumers' information without their knowledge or consent, Respondent caused and was likely to cause substantial injury that was not reasonably avoidable, because it occurred without consumers' knowledge, and was not outweighed by countervailing benefits to consumers or competition.

26.     Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service. 12 U.S.C. § 5531(d)(1). Additionally, an act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

27.     Respondent's acts of opening credit-card accounts using consumers' information without their knowledge or consent materially interfered with the ability of consumers to understand a term or condition of a consumer financial product or service, as they had no or limited knowledge of those terms and conditions, including associated fees.

28.     Additionally, Respondent's acts of opening credit-card accounts using consumers' information without their knowledge or consent took unreasonable advantage of the consumers' inability to protect their interests in selecting or using a consumer financial product or service.

29.     Therefore, Respondent engaged in "unfair" and "abusive" acts or practices that violate §§ 1031(c)(1), (d)(1), (d)(2)(B), and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(c)(1), (d)(1), (d)(2)(B), 5536(a)(1)(B).

### Findings and Conclusions as to
### Unauthorized Enrollment into Online-Banking Services

30.     During the Relevant Period, Respondent's employees used email addresses not belonging to consumers to enroll consumers in online-banking services without their knowledge or consent.

31.     Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

32.     Respondent's acts of enrolling consumers in online-banking services without their knowledge or consent took unreasonable advantage of consumers' inability to protect their interests in selecting or using a consumer financial product or service, including interests in having these products or services activated only after affirmative agreement and protecting themselves from security and other risks.

33.     Therefore, Respondent engaged in "abusive" acts or practices that violate §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B).

**Findings and Conclusions
as to Unauthorized Debit Cards**

34.     During the relevant period, Respondent's employees requested debit cards and created PINs to activate them without consumers' knowledge or consent.

35.     Section 1036(a)(1)(B) of the CFPA prohibits "abusive" acts or practices. 12 U.S.C. § 5536(a)(1)(B). An act or practice is abusive if it takes unreasonable advantage of the consumer's inability to protect his or her interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

36.     Respondent's acts of issuing debit cards to consumers without their knowledge or consent took unreasonable advantage of consumers' inability to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

37.     Therefore, Respondent engaged in "abusive" acts that violate §§ 1031(d)(2)(B) and 1036(a)(1)(B) of the CFPA. 12 U.S.C. §§ 5531(d)(2)(B), 5536(a)(1)(B).

## ORDER

### V
### Conduct Provisions

**IT IS ORDERED**, under §§ 1053 and 1055 of the CFPA, that:

38.     Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate §§ 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, by engaging in Improper Sales Practices.

### VI
### Independent Consultant's Report and Compliance Plan

**IT IS FURTHER ORDERED** that:

39.     Within 45 days of the Effective Date, Respondent must select an independent consultant with specialized experience in consumer-finance-compliance issues to conduct an independent review of Respondent's sales practices within the Community Bank Regional Bank Branch Network related to deposit accounts, credit-card accounts, unsecured lines of credit, and related products and services (Independent Consultant's Review). Respondent must submit the name of the independent consultant to the Regional Director for non-objection. Upon receipt of non-objection from the Regional Director, the Bank must retain the independent consultant. The Independent Consultant's Review must assess whether Respondent's current policies and procedures are reasonably designed to ensure that Respondent's sales practices comply with all applicable Federal consumer financial laws as defined in 12 U.S.C. § 5481(14), and that Respondent's employees do not engage in Improper Sales Practices.

40.     The Independent Consultant's Review must include but will not be limited to:

a.     whether Respondent's employees are required to undergo training reasonably designed to prevent Improper Sales Practices and other sales-integrity violations; whether such training is adequate, complete, and timely updated, provided when employees join Respondent, and repeated at sufficient recurring intervals during their employment to reinforce such training; whether training records are complete, accurate and adequate; and whether employees are informed of an obligation to report all sales-integrity issues internally through an "ethics hotline" or similar mechanism;

b.     whether Respondent's monitoring policies and procedures ensure that Respondent monitors employees' sales practices proactively, and that Respondent devotes sufficient personnel and resources to monitor those practices appropriately;

c.     whether Respondent has adequate policies and procedures for (i) receiving, retaining, and addressing consumer inquiries or complaints; (ii) receiving, retaining, and addressing employee allegations of Improper Sales Practices or any other allegations of sales-integrity violations; (iii) tracking and addressing indicators of potential Improper Sales Practices or any other sales-integrity violations; and (iv) identifying and remediating consumers for Improper Sales Practices or other sales-integrity violations identified after the Effective Date, as well as for correcting any related systemic issues identified after the Effective Date;

d.     whether Respondent's policies and procedures related to sales of deposit accounts, credit cards, unsecured lines of credit, and related products and services are reasonably designed to ensure consumer consent is obtained before any such product is sold or issued to a consumer. The Independent Consultant's Review

must include, but not be limited to, whether Respondent has adequate policies and procedures for capturing and retaining consumer signatures and other evidence of consent for such products and services, for providing a grace period before assessing fees on any deposit account, and for closing accounts in which there is no customer-initiated activity during the grace period without assessing fees; and

e.     whether Respondent's performance-management and sales goals for its employees are consistent with the objective of preventing Improper Sales Practices and other sales-integrity violations.

41.     Within 180 days of the retention of the independent consultant, the independent consultant must prepare a written report (Independent Consultant's Report) detailing the findings of the review and provide the Independent Consultant's Report to the Board or a committee thereof.

42.     Within 90 days of receiving the Independent Consultant's Report, the Board or a committee thereof must:

a.     In consultation with the independent consultant, develop a plan (Compliance Plan) to: (i) correct any deficiencies identified, and (ii) implement any recommendations or explain in writing why a particular recommendation is not being implemented; and

b.     submit the Independent Consultant's Report and the Compliance Plan to the Regional Director.

43.     The Regional Director may, in his or her discretion, make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, the Board or a committee thereof must make the requested revisions to the Compliance Plan, have the

independent consultant review the revised Compliance Plan for adequacy, accuracy, effectiveness, and completeness, and resubmit the revised Compliance Plan and the independent consultant's review of the revised Compliance Plan to the Regional Director within 60 days of the date that the Regional Director directs the Company to revise the Compliance Plan. The Regional Director may, in his or her discretion, consult with the Los Angeles City Attorney in arriving at a determination of non-objection to the Compliance Plan or direction to Respondent to revise the Compliance Plan.

44.     After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan and have the independent consultant review and assess compliance with the Compliance Plan and validate that the Compliance Plan has been properly executed; the results of such review should be submitted to the Regional Director within 30 days after completion.

## VII
## Role of the Board

**IT IS FURTHER ORDERED** that:

45.     The Board or a committee thereof must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order before submission to the Bureau.

46.     Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for

ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

47.     In each instance that this Consent Order requires the Board or a committee thereof to ensure adherence to, or perform certain obligations of Respondent, the Board or a committee thereof must:

       a.     authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

       b.     require timely reporting by management to the Board or a committee thereof on the status of compliance obligations; and

       c.     require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with directives from the Board or a committee thereof related to this Section.

## VIII
## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

48.     Respondent has retained the services of an independent third-party consulting firm (which is not the independent consultant referred to in Section VI) to identify consumers who have incurred fees or other charges as a result of Improper Sales Practices.

49.     Within 10 days of the Effective Date, Respondent must reserve or deposit into a segregated deposit account an amount not less than $5 million, for the purpose of providing redress to Affected Consumers as required by this Section.

50.     Within 90 days of the Effective Date, Respondent must submit to the Regional Director for review and non-objection the comprehensive written plan for

providing redress consistent with this Consent Order (Redress Plan). The Regional Director may, in his or her discretion, make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Redress Plan, Respondent must make the revisions and resubmit the Redress Plan to the Regional Director within 45 days. After receiving notification that the Regional Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

51.     The Redress Plan must:

a.     identify all Affected Consumers, except insofar as it is impracticable to do so, as well as the types and amounts of any fees or charges incurred by Affected Consumers as a result of the Improper Sales Practices, and state the means by which Affected Consumers have been identified and by which the fees or charges they incurred have been calculated;

b.     describe procedures by which Respondent will notify Affected Consumers who were subject to any of the Improper Sales Practices described in paragraph 3.f of this Order, including the form of the notification such consumers will receive;

c.     describe the process for providing redress to Affected Consumers and identify the dollar amount of redress for each category of Affected Consumers;

d.     detail how Respondent will locate Affected Consumers for payment of redress, and the steps Respondent will take with respect to consumers whose redress payments are returned as undeliverable or not cashed within a prescribed time period;

e.   state the manner in which redress will be provided to each such Affected Consumer, and the form of redress; and

f.   provide the form of the letter or notice that will be sent to such Affected Consumers notifying them of the redress.

52.   Within 120 days after completing the Redress Plan, Respondent's Internal Audit department must review and assess compliance with the terms of the Redress Plan (Redress Plan Review) and validate that the Redress Plan has been properly executed.

53.   Within 30 days after completion of the Redress Plan Review, Respondent must prepare and submit to the Regional Director a report summarizing the results of the Redress Plan Review.

54.   After completing the Redress Plan, if the amount of redress provided to Affected Consumers is less than $5 million, Respondent may recoup any remaining funds up to the amount Respondent paid to Affected Consumers before the submission of the Redress Plan as redress for fees or charges those Affected Consumers incurred as a result of the Improper Sales Practices. Respondent must, within 30 days of the completion of the Redress Plan, pay to the Bureau, by wire transfer to the Bureau or to the Bureau's agent and according to the Bureau's wiring instructions, any remaining funds not recouped by Respondent under this paragraph.

55.   The Bureau may use these remaining funds to pay additional redress to Affected Consumers. Upon receiving a written request from Respondent, the Bureau may provide Respondent with information concerning additional redress. If the Bureau determines, in its sole discretion, that additional redress is wholly or partially impracticable or otherwise inappropriate, or if funds remain after the additional redress

is completed, the Bureau will deposit any remaining funds in the U.S. Treasury as disgorgement. Respondent will have no right to challenge any actions that the Bureau or its representatives may take under this Section.

56.     Respondent may not condition the payment of any redress to any Affected Consumer under this Order on that Affected Consumer waiving any right.

## IX
## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

57.     Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, and taking into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $100 million to the Bureau.

58.     Within 10 days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

59.     The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

60.     Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

            a.      claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

        b.        seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

61.      To preserve the deterrent effect of any civil money penalty in the California Enforcement Action or any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the California Enforcement Action or any Related Consumer Action because of the civil money penalty paid in this action (Penalty Offset). If the court in the California Enforcement Action or any Related Consumer Action grants such a Penalty Offset, Respondent must, within 30 days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X
## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that**:**

62.      In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

63.      Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

64.     Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

65.     Within 30 days of the entry of a final judgment, consent order, or settlement in the California Enforcement Action or any Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## XI
### Reporting Requirements

**IT IS FURTHER ORDERED** that:

66.     Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

67.     Within 7 days of the Effective Date, Respondent must designate at least one telephone number and email, physical, and postal address as points of contact, which the Bureau may use to communicate with Respondent.

68.     Respondent must report any change in the information required to be submitted under Paragraph 67 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

69.     Within 90 days of the Effective Date, and again at least semi-annually until the actions under this Consent Order have been completed, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board or a committee thereof, which, at a minimum:

a.     describes in detail the manner and form in which Respondent has complied with this Order;

b.     separately lists each corrective action required by this Consent Order, the Compliance Plan, and the Redress Plan;

c.     Describes the current status of each corrective action taken and the required, actual, and anticipated completion date for each corrective action; and

d.     attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

## XII
## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

70.     Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

71.     For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members and executive officers, as well as to any managers, employees, or other agents and representatives who will have responsibilities related to the subject matter of this Consent Order before they assume their responsibilities.

72.     Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

## XIII
### Recordkeeping

**IT IS FURTHER ORDERED** that

73.     Respondent must create or, if already created, retain for at least 5 years from the Effective Date the following business records:

        a.      all documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau.

        b.      all documents and records pertaining to the Redress Plan, described in Section VIII above.

74.     Respondent must retain the documents identified in Paragraph 73 for the duration of the Consent Order.

75.     Respondent must make the documents identified in Paragraph 73 available to the Bureau upon the Bureau's request.

## XIV
## Notices

**IT IS FURTHER ORDERED** that:

76.     Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents relating to this

Consent Order in writing, with the subject line, "In re Wells Fargo Bank, N.A., File No.

2016-CFPB-0015," and send them as follows:

> a.     via email to WestRegion@cfpb.gov; and

> b.     via overnight courier (not the U.S. Postal Service) as follows:

Regional Director, CFPB West Region, 301 Howard Street, 12th Floor, San

Francisco, CA 94105.

## XV
## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

77.     Respondent must cooperate fully to help the Bureau determine the

identity and location of, and the amount of injury sustained by, each Affected Consumer.

Respondent must provide such information in its or its agents' possession or control

within 14 days of receiving a written request from the Bureau.

78.     Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section IV.

Respondent must provide truthful and complete information, evidence, and testimony

and Respondent must cause Respondent's officers, employees, representatives, or

agents to appear for interviews, discovery, hearings, trials, and any other proceedings

that the Bureau may reasonably request upon 5 days written notice, or other reasonable

notice, at such places and times as the Bureau may designate, without the service of compulsory process.

## XVI
## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

79.     Within 30 days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

80.     Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

81.     Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

82.     Respondent may seek a modification to non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

83.     The Regional Director may, in his or her discretion, modify any non-material requirements of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements) if he or she determines that good cause justifies the modification. Any such modification by the Regional Director must be in writing.

## XVIII
## Administrative Provisions

84.     The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 85.

85.     The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

86.     This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

87.     This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the

Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

88.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

89.    Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

90.    The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may seek to impose the maximum amount of civil money penalties allowed under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

91.    This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

92.     Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this _4th_ day of September, 2016.

Richard Cordray
Director
Consumer Financial Protection Bureau

# Exhibit 4

HOGAN V. WELLS FARGO – COMPLAINT FOR DAMAGES

**CONSENT FORM AND DECLARATION**

I hereby consent to join a lawsuit against Wells Fargo Bank & Co., Wells Fargo Bank, N.A., and/or Wells Fargo Securities, LLC (collectively, "Wells Fargo") as a Plaintiff to assert claims against it for violations of the wage and hour laws of the United States and/or the state(s) where I worked for Wells Fargo. During the past three years, there were occasions when I worked over 40 hours per week for Wells Fargo and did not receive overtime compensation, although I was an hourly, non-exempt employee who was entitled to overtime compensation.

I worked for Wells Fargo as a (please check all that apply):
☑ Personal Banker 1
☑ Personal Banker 2
☑ Teller
☑ Other (Specify Title: ___CSSR_____)

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Justin N. Harris*                    December 26, 2016
_____         _____
Signature                                          Date

Justin Nicolas Harris
_____
Print Name

**Fax or E-Mail To:**

**LAW OFFICES OF**
**JONATHAN J. DELSHAD, P.C.**
**1663 Sawtelle Blvd., Suite 220**
**Los Angeles, CA 90025**
**Fax: (424) 256-7899**

Thousand Oaks/ Westlake Village CA
_____
Location(s) Worked (City/State)

CONSENT AND DECLARATION